**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BEECHWOOD PLAZA HOTEL OF APPLETON, LLC, UNIVERSITY HOTEL DEVELOPMENT, LLC, and KNK-PLAZA OF GREEN BAY, LLC, | Civil Action No. _____ |
| Plaintiffs, | |
| v. | |
| WILMINGTON TRUST, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-SG1, Commercial Mortgage Pass-Through Certificates, Series 2015-SG1, | |
| Defendant. | **COMPLAINT** |

Plaintiffs, Beechwood Plaza Hotel of Appleton, LLC, University Hotel Development, LLC and KNK-Plaza Hotel of Green Bay, LLC ("Borrowers"), by and through their attorneys MAHANY LAW & MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, allege the following against the Defendant:

## INTRODUCTION

1.      Over the past two months, economies have plummeted as a result of the economic crisis caused by the COVID-19 pandemic (the "Pandemic").  In response, federal and state governments have started, and continue to, implement measures to

contain the Pandemic, including ordering in many instances all non-essential business to remain closed and requiring individuals to stay in their homes.[1]

2.      The hotel industry has been hit particularly hard as the result of "stay at home" and other governmental orders limiting and/or precluding travel that have essentially forestalled the hotel industry from operating.  Governments, both federal and state, have and continue to require businesses to remain closed and people to stay in their homes.

3.      Borrowers, three hotel operators, bring this complaint for declaratory relief.  Borrowers' loans are held by Commercial Mortgage Backed Securities ("CMBS") Trusts.  CMBS loans are bundled into a trust, and bonds supported by the stream of interest payments from the loans are then sold to investors.  The Trusts are administered by Wells Fargo, National Association ("Wells Fargo"), who acts as the agent and master servicer of the Trust, and Rialto Capital Advisors, LLC ("Rialto"), who acts as the agent and special servicer of the Trust.

4.      On March 27, 2020, in response the Pandemic, the federal government passed the Coronavirus Aid Relief, and Economic Security ("CARES") Act thereby creating the Paycheck Protection Program ("PPP").  The PPP is a federally supported program designed to provide short-term financial assistance to small business to help soften the immediate economic impact of the Pandemic.

---

[1] Collectively, Borrowers operate hotels in North Dakota and Wisconsin.  On March 24th, Wisconsin Governor Tony Evers issued a "Safer at Home" order restricting non-essential travel outside the home. The Centers for Disease Control and Prevention, the President of the United States and the North Dakota Department of Health have issued similar advisories.

5.     The PPP, in part, was meant to assure that small business could survive the economic fallout of the Pandemic and continue to make payroll and other "allowable costs," including providing health benefits to employees, rent and utilities.  To the extent the PPP funds are used for allowable uses, they are fully forgivable.  The PPP was meant to provide a disincentive for business laying off their employees, as the government would be largely responsible for unemployment benefits if those employees were laid off.

6.     The Borrowers' loan agreements with the Defendant prohibit the Borrower from taking on additional indebtedness.  Specifically, Section 5.22 of the Loan Agreements (defined *supra*,) provides: "Borrower shall not directly or indirectly create, incur or assume any indebtedness other than (i) the Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property, which in the case of such unsecured trade payables (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of four percent (4%) of the then outstanding amount of the Principal, and (C) are paid within one hundred twenty (120) days of the date incurred (collectively, "Permitted Indebtedness")."

7.     Because the PPP funds potentially are entirely forgivable, like grants, it is unclear whether the Defendant will consider the PPP funds to be indebtedness under the Loan Agreements. In spite of numerous requests for clarification by the Borrowers, the Defendant has failed to provide any response as to whether the Defendant will consider the Borrowers obtaining PPP funds as additional indebtedness and thus a default under the respective Loan Agreements.

8.     The Borrowers' desire to participate in the PPP, but as a result of certain loan restrictions, including the prohibition on additional indebtedness and springing recourse guarantees, participation in the PPP may trigger onerous default provisions.  The Borrowers have repeatedly asked the Defendant and its agent for its position on the Borrowers' participation in the PPP and/or waivers from the additional indebtedness and springing recourse provisions.  For several weeks, the Defendant refused to respond or offer waivers from the additional indebtedness provision, despite the fact that the PPP funds may be fully forgivable.  *See* §1106(i) of the CARES Act.

9.     Borrowers seek a declaration that (i) the prohibition against additional indebtedness contained in the Loan Documents is unenforceable as a violation of public policy in regard to the PPP funds, and (ii) that bringing this action is not an event of default under the Loan Documents.

10.     As a direct result of the Pandemic, Borrowers have been suffering an almost complete loss of income for more than 30 days, and it is imperative for the Borrowers to obtain PPP funds to prevent the closure of their businesses permanently, resulting in loss of jobs for their employees – the very societal harm the federal government is trying to avoid by enacting the PPP.

11.     The opportunistic and improper behavior of Defendant amid the most significant economic crisis in a generation – and while government efforts to restore liquidity to markets are underway – must be stopped.  Defendant's actions and inactions pose an existential threat to Borrowers' very existence and risk undermining government efforts to stabilize financial markets.

## PARTIES

12.     Plaintiff Beechwood Plaza Hotel of Appleton, LLC ("Beechwood Appleton") is a Wisconsin limited liability company and SPE that owns a hotel in Appleton, Wisconsin, with its primary offices located at 1025 Thoroughbred Ln., De Pere, WI 54115.

13.     Plaintiff University Hotel Development, LLC is a North Dakota limited liability company and an SPE that owns a hotel in North Dakota with its primary offices located at 1025 Thoroughbred Ln., De Pere, WI 54115.

14.     Plaintiff KNK-Plaza Hotel of Green Bay, LLC is a Wisconsin limited liability company that owns a hotel in Green Bay, Wisconsin with its primary offices located at 1025 Thoroughbred Ln., De Pere, WI 54115.

15.     Defendant is Wilmington Trust, NA as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-SG1, Commercial Mortgage Pass-Through Certificates Series 2015-SG1.  Wilmington Trust, National Association has its principal place of business at 1100 North Market Street, Wilmington, DE, 19890, with offices of its registered agent, Robert C. Fielder, Vice President and Counsel located at 1100 North Market Street, Wilmington, DE, 19890 ("Wilmington Trust").[2]

## JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as the controversy is between citizens of different states and the potential damages for the Plaintiff if it is not granted declaratory relief are potentially tens of millions of dollars and well exceed the $75,000.00 jurisdictional threshold.

---

[2] Wilmington Trust is referred to herein at times as "Lender."

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as pursuant to the contract between the Parties, the parties have agreed that venue is appropriate "in any federal or state court in New York County New York." (*See*, for example, Exhibit 2, University Hotel Loan Agreement, p. 88, ¶ 10.6 (b)).

## FACTUAL ALLEGATIONS

18.     Societe Generale made a loan to Beechwood Appleton in original principal amount of $10,855,000, pursuant to that certain Loan Agreement dated June 10, 2015 (the "Beechwood Appleton Loan Agreement", Exhibit 1).   The loan is evidenced by that Certain Promissory Note dated June 10, 2015 (the "Beechwood Appleton Promissory Note") executed by Beechwood Appleton in favor of Societe Generale, and is secured by certain real property located in Appleton, WI.

19.     Upon information and belief, Societe Generale subsequently transferred the Beechwood Appleton loan, the Beechwood Appleton Loan Agreement and the Beechwood Appleton Promissory Note to Wilmington Trust, National Association as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-SG1, Commercial Mortgage Pass-Through Certificates Series 2015-SG1, the Wilmington Trust.

20.     Upon information and belief, Wilmington Trust, National Association as Trustee, for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-SG1, Commercial Mortgage Pass-Through Certificates Series 2015-SG1, the Wilmington Trust, is the current Holder of the Beachwood Appleton loan, Beachwood Appleton Loan Agreement and Beachwood Appleton Promissory Note.

21.     The Beachwood Appleton loan, Beechwood Appleton Loan Agreement and Beachwood Appleton Promissory Note are serviced by Wells Fargo who acts as the agent of Wilmington Trust and master servicer of the Beechwood Appleton Loan, and by Rialto who acts as the agent and special servicer for the Wilmington Trust.

22.     Societe Generale made a loan to University Hotel in the original principal amount of $10,920,000, pursuant to that certain Loan Agreement dated June 10, 2015 (the "University Hotel Loan Agreement", Exhibit 2).   The University Hotel loan is evidenced by that Certain Promissory Note dated June 10, 2015 (the "University Hotel Promissory Note") executed by University Hotel in favor of Societe Generale and is secured by certain real property located in Grand Forks, ND.

23.     Upon information and belief, Societe Generale subsequently transferred the University Hotel loan, the University Hotel Loan Agreement and the University Hotel Promissory Note to Wilmington Trust, National Association as Trustee, for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-SG1, Commercial Mortgage Pass-Through Certificates Series 2015-SG1, the Wilmington Trust.

24.     Upon information and belief, Wilmington Trust, National Association as Trustee, for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-SG1, Commercial Mortgage Pass-Through Certificates Series 2015-SG1, Wilmington Trust, is the current Holder of the University Hotel loan, Hotel University Loan Agreement and Hotel University Promissory Note.

25.     The University Hotel loan, University Hotel Loan Agreement and University Hotel Promissory Note are serviced by Wells Fargo who acts as the agent of

and master servicer of the Wilmington Trust, and by Rialto, who acts as the agent and special servicer of the Wilmington Trust.

26.     Societe Generale made a loan to KNK-Plaza in the original principal amount of $16,700,000, pursuant to that certain Loan Agreement dated June 10, 2015 (the "KNK-Plaza Loan Agreement", Exhibit 3).  The KNK-Plaza loan is evidenced by that Certain Promissory Note dated June 10, 2015 (the "KNK Plaza Promissory Note") executed by KNK Plaza in favor of Societe Generale and is secured by certain real property located in Green Bay, WI.

27.     Upon information and belief, Societe Generale subsequently transferred the KNK-Plaza loan, the KNK Plaza Loan Agreement and the KNK Hotel Promissory Note to Wilmington Trust, National Association as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-SG1, Commercial Mortgage Pass-Through Certificates Series 2015-SG1, the Wilmington Trust.

28.     Upon information and belief, Wilmington Trust, National Association as Trustee, for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2015-SG1, Commercial Mortgage Pass-Through Certificates Series 2015-SG1, the Wilmington Trust, is the current Holder of the KNK-Plaza loan, KNK-Plaza Loan Agreement and KNK-Plaza Note.

29.     The KNK Plaza loan, KNK-Plaza Loan Agreement, and KNK-Plaza Promissory Note are serviced by Wells Fargo, who acts as the agent and master servicer of the of the Wilmington Trust, and by and Rialto, who acts as the agent and special servicer for the Wilmington Trust.

30.     The Beechwood Appleton Loan Agreement, the University Hotel Loan Agreement, and the KNK Plaza Loan Agreement (the collectively, "Loan Agreements") contain the following prohibition regarding additional indebtedness:

**Indebtedness.**  Borrower shall not directly or indirectly create, incur or assume any indebtedness other than (i) the Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property, which in the case of such unsecured trade payables are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of four percent (4%) of the loan then outstanding amount of the Principal and (C) are paid within one hundred twenty (120) days of the date incurred (collectively, "*Permitted Indebtedness"*).

31.     The Loan Agreements contain an exculpation/non-recourse clause which reads in part:  "Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding where a money judgment shall be sought against the Borrower . . . except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against the Borrower only to the extent of Borrower's interest in the Property, the Rents or any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document." (Loan Agreements, § 10.1)

32.     The Loan Agreements further provide:  "(B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND

VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each a ***"Springing Recourse Event"):***

> **(ii)  . . . . a breach of the covenants set forth in Section 5.13 hereof".** (Loan Agreements, § 10.1(ii))

33.      Section 5.13 of the Loan Agreements reads:

> "**Special Purpose Entity.**   Borrower shall at all times be a Special Purpose Entity.  Borrower shall not make any change or amendment or modification to its organizational documents, or otherwise take any action which could result in Borrower not being a Special Purpose Entity.  A ***"Special Purpose Entity"*** shall have the meaning set forth on Schedule 5 hereto."

34.      Schedule 5, (xxi) states, "(a) if any such entity owns the Property, had not and will not have any indebtedness other than Permitted Indebtedness."

35.      Borrowers wish to avoid any declaration of default or declaration that a Springing Recourse Event has occurred because they accessed PPP funds to keep their business above water while continuing to pay their employees, consistent with the federal government's purpose in passing the CARES Act.

36.      The Loan Agreements also provides, "An 'Event of Default' shall exist with respect to the Loan if any of the following shall occur

> any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of the Debt, ceases to be in full force and effect; or Borrower or Guarantor contests in any manner the validity or enforceability of any Loan Document; or Borrower of Guarantor denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind and Loan Document." (Loan Agreements § 8.1(k)).

37.     Borrowers wish to avoid any declaration of default as result of brining this action for a declaratory judgment seeking a determination of the parties' rights under the Loan Agreement.  The Borrowers are not challenging the terms of Loan Agreements generally, but bring this action solely in response to a rescue package created by the Federal Government, in response to an unprecedented Pandemic, which allows the Borrowers to access fully forgivable funds to save their business and the jobs of their employees.

## LENDER'S FAILURE TO CONSIDER FORBEARANCE OR PROVIDE ANY RESPONSE IN REGARD TO BORROWERS' ANTICIPATED PARTICIPATION IN THE PPP.

38.     On March 19, 2020, Plaintiffs' counsel communicated with Wells Fargo, Master Servicer, seeking short term assistance as a result of the Pandemic, including relief from principal payments, interest payments and Fixture, Furniture and Equipment reserves to allow the Borrowers to weather the storm until full operations could be restored.

39.     Receiving no response, Plaintiffs again communicated with Wells Fargo on March 20, 2020.  Plaintiffs finally received a response on March 23, 2020, which stated:  "Wells Fargo is the master servicer of the CMBS trust which owns your loan.  In the capacity, Wells Fargo has no authority to provide any immediate relief, waiver or forbearance to the monetary terms of your loan.  As this is a rapidly evolving situation, be aware that we are in ongoing communications with the trust's named special servicer (Rialto Capital) as to the best way to manage potential borrower issues related to COVID-19.  The special servicer is the entity that has been hired by the bondholders to

make material decisions regarding your loan."   As opposed to providing contact information for those at Rialto who could make material decisions regarding the Loan Agreements, Wells Fargo requested substantial information from the Borrowers.

40.    Shortly thereafter on March 23, 2020, less than one hour after receiving Wells Fargo's belated response, the Borrowers responded by informing Wells Fargo that the information requested would be assembled as quickly as possible.  Borrowers also asked Wells Fargo: "Will you then forward our request to Rialto or should we contact someone there?  The federal government is ordering lenders to offer homeowners reduced or suspended mortgage payments for up to 12 months.  Similarly, NY state is ordering financial institutions to waive mortgage payments for 90 days.  Others are implementing similar programs.  Could you share what reforms Wells Fargo and Rialto are discussing to help borrowers, and the overall economy, survive the crisis?"

41.    On March 24, 2020, less than twenty-four hours after the initial request, Borrowers provided Wells Fargo with virtually all of the information that had been requested, with the exception of information contained on Hilton's Revenue Management System which was, at that time, experiencing technical difficulties.  Borrowers also asked Wells Fargo the following: "The federal government and multiple states have started providing disaster relief to small businesses in the form of grants or loans.  Could you or Rialto confirm that Borrowers can apply for disaster relief loans without triggering a default under the existing loans?"

42.    On March 24, 2020, Wells Fargo responded that it was forwarding the Borrowers' request and information to Rialto, the special servicer.

43.     On March 29, 2020, after receiving no response from Wells Fargo or Rialto, the Borrowers again communicated with Wells Fargo and asked: "I was wondering if these [Borrowers] could apply for SBA/CARES Act loans through Wells Fargo, since it is an SBA lender.  I would think that the existing relationship with the bank would help the process go more quickly and smoothly.  Please let us know.  As the SBA is expected to begin accepting loan applications under the CARES act within a couple of days, we are trying to gather and prepare all the required materials as quickly as possible.  As you know, timing especially important since any delay means the funding for these relief loans could be quickly exhausted.  Unfortunately, these borrowers still need confirmation that they can take on this debt without triggering a default on the existing loans . . . we have not heard from Rialto regarding this matter.  I would appreciate if you would follow up with them.  I understand that they are overwhelmed at the moment, but with so many hotels in desperate need of this relief, it would be inconceivable for them to stand in the way."

44.     After receiving no response, the Borrowers followed up with Wells Fargo on March 30, 2020, and again asked, "I'm sure you are very busy at the moment.  However, we would much appreciate if you could at least let us know whether these debtors could apply for the SBA Paycheck Protection Loans through Wells Fargo – and who we could speak with about preparing our applications."

45.     On March 30, 2020, Wells Fargo responded stating: (a) "Regarding SBA loans, I am not authorized to advise you on how to proceed, but generally most loan document will not allow the SPE borrower to incur additional debt;" (b) "I have not heard anything from Rialto;" and (c) "In general, a special servicer cannot modify the timing or

amount of your principal and interest payments unless the servicing of the loan is formally transferred from the master servicer to the special servicer (i.e. the loan becomes a 'specially serviced loan').  When a loan is transferred to the special servicer, the special servicer will have full authority over all decisions to be made with respect to the loan and the borrower will no longer have direct communications with Wells Fargo.  As the Special Servicer is a third party, Wells Fargo cannot opine or advise you as to what action the special servicer may or may not ultimately take with respect to your loan.  In addition, we encourage you to review your loan documents as many loan documents obligate the borrower to pay all special servicing fees."

46.     On March 30, 2020, Borrowers reached out directly to Rialto, the special servicer and stated:  "It has been 10 days since I reached out to Wells Fargo for relief for the above borrowers and at least 6 days since David Potier forwarded the request and accompanying information to you.  We have still heard nothing from Rialto about this request.   Please direct me to someone who can assist ASAP.   I know you are overwhelmed right now.  So are we.  My clients are trying to keep their businesses alive. And you are making it much harder.  **All we need at the moment is consent for these borrowers to accept the disaster relief that the government is offering in the form of SBA Paycheck Protection loans.**   Do you have any policy in place for allowing borrowers to obtain these unsecured, non-recourse, unguaranteed loans, which are subject to forgiveness, that the government is giving away as disaster relief?  Are you really going to prevent CMBS borrowers from accepting disaster relief?  These hotels need to apply for SBA Paycheck Protection loans immediately once they become available.

What documents do you need to review and process this request?  We will send them. Please can we get this started now."  (Emphasis in original).

47.    On April 1, 2020, Borrowers reached out to Rialto through counsel that was representing Rialto on an unrelated issue relating to the Beechwood Appleton Property and stated:  "Please note that this Borrower and three related borrowers have now been waiting for over a week to hear from your client.  We have received no response, or acknowledgement, regarding their request for a 90-day payment deferral and some assurance that they do not intend to call a default for borrowers' obtaining disaster relief through the Paycheck Protection Program.  The written assurance is needed most urgently.  The borrowers need to submit applications early Friday morning to ensure they are processed before program funding runs out."

48.    On April 1, 2020, Rialto's counsel responded: "With regards to your request, I have forwarded your email to Rialto.  Please note that while I have forwarded your email to Rialto for review, the Borrower must contact the Master Servicer [Wells Fargo] for these requests per the Loan Documents."  Borrowers responded: "Thank you Christina.  The Master Servicer told me that he passed on this request to Rialto over a week ago."

49.    On April 9, 2020, after receiving no response from Rialto or Wells Fargo, Borrowers again wrote directly to Rialto explaining: "[T]he requested relief is urgently needed and vital to the borrowers listed above.  Please be aware the Master Servicer (Wells Fargo) provided our requests to Rialto over two weeks ago.  Since then, we have not received any communication from Rialto, not even acknowledgement of receipt or any response to our follow-up email.  While I understand that providing formal consent

takes time, we would expect to at least receive some informal guidance and updates on the status of our requests – at the very least some acknowledgment that our request was received."

50.     On April 16, 2020, three weeks after the initial request, Wells Fargo -- not Rialto -- responded to Borrowers' April 9 request and stated: "Subsequent to your email below to Rialto, Rialto has now asked that Wells Fargo as master servicer transfer the loan to special servicing.   Rialto cannot evaluate your payment relief request further unless the loan become special serviced.   The purpose of this email is (1) to make you aware that a transfer to special servicing is about to occur and (2) to inquire as to whether you have any other means to make May payment absent transfer."

51.     On April 16, bewildered by the conduct and complete refusal to have any substantive conversations by both the Wells Fargo and Rialto, Borrowers responded: "We do not want the loans transferred to special servicing if it means saddling the borrower with additional servicing fees.   You are saying that no one can even consider a request for payment relief until the loans are transferred to special servicing?   So the borrowers can't even get an answer regarding payment relief without become liable for additional servicing fees for the duration of the loan?   In normal times, this could be considered extortionist.   Under the current circumstances, it's reprehensible.   The loan agreement indicates that borrowers are liable for servicing fees 'from and after a transfer of the Loan to any special servicer following an Event of Default.'   But no default of Event of Default has occurred.   Special servicing is not needed, and the borrowers do not agree to pay any additional fees for it.   We have merely asked the question – can you provide borrowers any of the requested relief?   And the servicers have thus far refused to provide answers.

We still have received no response at all regarding the non-payment relief that we requested weeks ago – namely, consent to participate in the Paycheck Protection Program, which is already out of funding, and consent to temporarily cease operations, if necessary.  Regarding point 2, yes the borrowers should be able to make their May payments absent payment relief.  Does that make them ineligible for payment relief?"

52.     Subsequent to April 16, 2020, Borrowers conducted further conversations with Rialto, but have received no substantive response regarding consent to the Borrowers participating in the PPP or whether the Defendant will consider such participation as a default.

## THE COVID-19 CRISIS

53.     Over the past two months, the impact of the Pandemic on the economy has wreaked havoc on the equity markets.  Furthermore, amidst market participant concerns regarding liquidity, the debt markets have also become volatile, and prices declined significantly.   The debt market decline, however, did not reflect a decline in the fundamental value of the debt securities as opposed to the absence of liquidity in the marketplace.  This volatility has hit the CMBS markets particularly hard.

54.     At all levels of government, banking authorities have made clear that their overriding concern is that market participants such as Defendant do not transform the current temporary disruption in credit markets into a full-blown credit crisis.   The CARES Act is the first attempt by the federal government to rescue the economy during this crisis.

55.     With respect to the market for mortgage related securities, like CMBS loans, the Federal Reserve has taken urgent action to support market value and return

market liquidity, while state and federal regulators have urged banks to desist from foreclosing on their clients' assets.  It would be short-sighted in the extreme and contrary to public policy for lenders such as Defendant to use the Pandemic as a pretext to find Borrowers in technical default of the their Loan Agreements – especially when Borrowers' have not missed a single payment – or worse, declare Plaintiffs in default, accelerate the full outstanding balance to become due, seize Borrowers' assets and liquidate them (or allow their special servicer to purchase them) at distressed prices, all while the government is furiously working to prevent such destabilizing actions.

56.     On March 22, 2020, the Federal Reserve, in concert with the Office of the Comptroller of the Currency and the other federal banking agencies, issued an "Interagency Statement on Loan Modification and Reporting for Financial Institutions Working with Customers Affected by the Coronavirus," which recognizes the "temporary" nature of the business disruptions and challenges posed by the national emergency and urges "financial institutions to work prudently with borrowers who are or may be unable to meet their contractual payment obligations because of the effects of COVID-19."  The Statement adds that "[t]he agencies view loan modification programs as positive actions that can mitigate adverse effects on borrowers due to COVID-19" and serve "the best interest of institutions, their borrowers, and the economy."[3]

57.     On March 23, 2020, the Federal Reserve announced that it would include CMBS among the $200 billion in agency backed mortgage-backed securities it plans to purchase as part of its efforts to support smooth market functioning.[4]

---

[3] Available at https://www.fdic.gov/news/news/press/2020/pr20038a.pdf.

[4] https://federalreserve.gov/newsevents/pressreleases/monetary20200323a.htm.

58.     On April 7, 2020, the Federal Reserve revised its March 22, 2009 Interagency Statement advising that "[t]he agencies will not criticize institutions for working with borrowers in a safe and sound manner" and that "[f]inancial institutions have broad discretion to implement prudent modification programs consistent with the framework included in this statement."  In fact, the revised statement relaxes financial institutions' accounting policies for a limited time to account for the effects of COVID-19, specifically related to trouble debt restructuring ("TDR").[5]

59.     The Federal Reserve's interventions all recognize that the challenge facing the markets is to bridge the disruptions caused by the COVID-19 pandemic and maintain the flow of capital to – not away from – borrowers such as Plaintiffs.

60.     On March 22, 2020, New York Governor Andrew Cuomo issued Executive Order No. 202.9, "Continuing Temporary Suspension and Modification of Laws Relating to Disaster Emergency," directing all banks subject to the jurisdiction of the State of New York Department of Financial Services, to grant forbearances with respect to any business that has a financial hardship as a result of the Pandemic. The failure to grant such a forbearance is deemed an "unsafe and unsound business practice" under the Banking Law.[6]

---

[5]   Available   at   https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20200407a1.pdf. Specifically, the Federal Reserve advises that "working with borrowers who are current on existing loans, either individually or as part of a program for creditworthy borrowers who are experiencing short-term financial or operational problems as a result of COVID-19 generally would not be considered TDRs. More specifically, financial institutions may presume that borrowers are not experiencing financial difficulties at the time of the modification for purposes of determining TDR status, and thus no further TDR analysis is required for each loan modification in the program, if: The modification is in response to the National Emergency; The borrower was current on payments at the time the modification program is implemented; and • The modification is short-term (e.g., six months).

[6]   Available   at   https://www.governor.ny.gov/news/no-2029-continuing-temporary-suspension-and-modificationlaws-relating-disaster-emergency.

61.     By their collective action, New York and federal banking agencies have made clear to lenders, that they must work cooperatively with clients affected by the Pandemic and that it is the national interest and the interest of the State of New York to do so. As authorities marshal their resources to prevent banks from foreclosing on their customers and to provide liquidity to the market, the only commercially reasonable course of action is to forebear from triggering a vicious cycle of forced liquidations and depressed market values. Defendant's inactions in the face of Borrowers' numerous attempts to determine whether participation in the PPP would trigger default provisions in the Loan Agreements are an attempt to capitalize on the Pandemic and force Plaintiffs' into an untenable position of deciding whether to keep their businesses afloat or face technical defaults and springing guarantees, by accessing the PPP funds.

62.     By their express terms, the Loan Agreements are to be governed and construed in accordance with New York law.

63.     Defendant has refused provide any insight as to whether they will deem Borrowers' participation in the PPP program a default under the Loan Agreements despite the state and federal mandates providing that lenders are to work with borrowers in a prudent and reasonable manner.

64.     Defendant's conduct flies in the face of Governor Cuomo's Executive Order No. 202.9 and its determination that "it shall be deemed an unsafe and unsound business practice if, in response to the Pandemic, any bank which is subject to the jurisdiction of the [New York State Department of Financial Services] shall not grant a forbearance to any person or business who has a financial hardship as a result of the

COVID-19 pandemic."  Notwithstanding the Governor's mandate, Defendant has refused to adhere to Governor Cuomo's order.

65.     The public policy set forth by both the Federal Reserve and the State of New York make clear that Borrowers' should not be penalized for seeking aid through the PPP program.

### FIRST CLAIM FOR RELIEF – DECLARATORY JUDGMENT

66.     Plaintiffs repeat, reiterate, and allege each and every allegation of paragraphs 1 through 65 of this Complaint as is fully set forth herein.

67.     Borrowers have entered into Loan Agreements with the Defendant which contain provisions that Defendant will likely claim prevent Borrowers from accessing and participating in the PPP program (i.e., the additional indebtedness provisions).

68.     The PPP was designed and implemented by the federal government to combat the economic disaster caused the Pandemic, keep markets liquid, keep business for going bankrupt and keeping millions of Americans employed, while keeping those same Americans off the unemployment rolls.

69.     To further those goals, the federal government created the PPP, to provide funds to flow directly to American small business, while at the same time making those funds fully forgivable and relieving the obligation of any participant in the PPP to repay the funds if certain guidelines are followed.

70.     The federal government along with the State of New York have made their policy clear that they expect lenders to work with borrowers suffering the results of the Pandemic and the federal government has allocated a significant amount of funds to assist in that effort.

71.     Borrowers have an existing and credible concern that the prohibition on additional indebtedness in the Loan Agreements may be applied by Defendant to prohibit the Borrowers from participating in the PPP to stay afloat and keep hundreds of individuals employed.  Such an interpretation is in direct violation of clearly stated public policy.

72.     An actual controversy has arisen between the parties as to whether the additional indebtedness prohibitions in the Loan Agreements violate public policy as applied to the Borrowers' participation in the PPP.

73.     By virtue of the public policy, Borrowers are entitled to a judgment pursuant to 28 U.S.C. § 2201 declaring the prohibitions contained in the Loan Agreements prohibiting additional indebtedness, are null and void as against public policy as it relates the PPP.

## SECOND CLAIM FOR RELIEF – DECLARATORY JUDGMENT

74.     Plaintiffs repeat, reiterate, and allege each and every allegation of paragraphs 1 through 73 of this Complaint as is fully set forth herein.

75.     The federal government, along with the State of New York, have made their policy clear that they expect lenders to work with Borrowers suffering the results of the Pandemic and the federal government has allocated a significant amount of funds to assist in that effort and not take advantage of onerous loan terms.

76.     Borrowers have an existing and credible concern that the prohibitions of §8.1(k) of the Loan Agreements, including but not limited to, the Borrowers challenging "in any manner the validity of enforceability of the loan documents" may be used by

Defendant as a retaliatory measure to place the Borrowers in default. Such a contractual provision is in direct violation of clearly stated public policy.

77.     An actual controversy has arisen between the parties as to whether the Borrowers bringing this action to determine whether additional indebtedness prohibitions discussed herein violate public policy in regard to the Borrowers' participation in the PPP is a violation of the Loan Documents and/or challenges the "validity and enforceability of the loan documents.

78.     By virtue of the public policy, Borrowers are entitled to a judgment pursuant to 28 U.S.C. § 2201 declaring the any prohibitions in the Loan Documents against bringing the present action to be null and void.

79.     In the alternative, by virtue of public policy, Borrowers are entitled to a judgment pursuant to 28 U.S.C. § 2201 declaring the present action does not challenge the validity of enforceability of the loan documents.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand and pray the Court grant relief, as follows:

    a.  A determination and declaration that the prohibitions contained in the Loan Agreements prohibiting additional indebtedness, are null and void as against public policy as it relates the PPP.

    b.  A determination and declaration that bringing this action is not an event of default under the Loan Documents.

    c.  Awarding each of the Plaintiffs its costs, attorneys' fees, and such other and further relief as this Court shall deem just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS AND ON ANY AND
ALL DEFENSES**.**

May 1, 2020
New York, New Yok

MCELROY, DEUTSCH, MULVANEY
   & CARPENTER LLP

By: /s/ Joseph P. La Sala
Joseph P. LaSala, Esq.
225 Liberty Street, 36th Floor
New York, NY 10281
Tel:  (212) 483-9490
Fax: (212) 483-9129
jlasala@mdmc-law.com

MAHANYLAW, LLC
Attorneys for Plaintiffs
(pro hac motion to be filed)

Christopher P. Katers, Esq.

8112 W. Bluemound Road, Suite 101
Wauwatosa, WI 53213
Tel: (414) 777-0778
Fax: (414) 777-0776
ckaters@mahanylaw.com