# EXHIBIT 1

---

## LOAN AGREEMENT

Dated as of June 10, 2015

Between

### BEECHWOOD PLAZA HOTEL OF APPLETON, LLC,
a Wisconsin limited liability company,
as Borrower

And

### SOCIETE GENERALE,
as Lender

---

# TABLE OF CONTENTS

**Page**

1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION ...................................................1

    1.1    Specific Definitions .........................................................................1
    1.2    Index of Other Definitions ............................................................16
    1.3    Principles of Construction.............................................................20

2.    GENERAL LOAN TERMS ...............................................................................20

    2.1    The Loan ........................................................................................20
    2.2    Interest; Monthly Payments ..........................................................20
    2.3    Loan Repayment ............................................................................22
    2.4    Release of Property .......................................................................25
    2.5    Payments and Computations .........................................................26

3.    CASH MANAGEMENT AND RESERVES ........................................................26

    3.1    Cash Management Arrangements ...................................................26
    3.2    Intentionally Omitted ....................................................................27
    3.3    Taxes and Insurance ......................................................................27
    3.4    Capital Expense Reserves .............................................................27
    3.5    Debt Service Reserve/Franchise Reserve .....................................28
    3.6    Casualty/Condemnation Subaccount .............................................29
    3.7    Security Deposits ...........................................................................29
    3.8    Cash Collateral Subaccount ..........................................................29
    3.9    Grant of Security Interest; Application of Funds...........................30
    3.10   Property Cash Flow Allocation .....................................................30
    3.11   Room Refresh Reserve ..................................................................31
    3.12   Supplemental Refresh Account......................................................32

4.    REPRESENTATIONS AND WARRANTIES.....................................................33

    4.1    Organization; Special Purpose ......................................................33
    4.2    Proceedings; Enforceability ..........................................................33
    4.3    No Conflicts ...................................................................................33
    4.4    Litigation .......................................................................................34
    4.5    Agreements ....................................................................................34
    4.6    Title ...............................................................................................34
    4.7    No Bankruptcy Filing ....................................................................35
    4.8    Full and Accurate Disclosure ........................................................35
    4.9    Tax Filings .....................................................................................36
    4.10   ERISA; No Plan Assets .................................................................36
    4.11   Compliance ....................................................................................36
    4.12   Major Contracts .............................................................................37

Page

4.13  Federal Reserve Regulations; Investment Company Act; Bank Holding Company ........................................................................................37
4.14  Easements; Utilities and Public Access ......................................................37
4.15  Physical Condition ......................................................................................37
4.16  Intentionally Omitted .................................................................................38
4.17  Fraudulent Transfer ...................................................................................38
4.18  Ownership of Borrower ..............................................................................38
4.19  Purchase Options ........................................................................................38
4.20  Management Agreement ..............................................................................38
4.21  Hazardous Substances ................................................................................38
4.22  Name; Principal Place of Business ............................................................39
4.23  Other Debt ..................................................................................................39
4.24  Assignment of Leases and Rents ...............................................................39
4.25  Insurance ....................................................................................................39
4.26  FIRPTA .......................................................................................................39
4.27  Fiscal Year ..................................................................................................40
4.28  Intellectual Property/Websites ...................................................................40
4.29  Operations Agreements ..............................................................................40
4.30  Illegal Activity ...........................................................................................40
4.31  Patriot Act; Foreign Corrupt Practices Act ...............................................40
4.32  Franchise Agreement ..................................................................................40

5.    COVENANTS ........................................................................................................41

5.1   Existence .....................................................................................................41
5.2   Taxes and Other Charges ...........................................................................41
5.3   Access to Property ......................................................................................41
5.4   Repairs; Maintenance and Compliance; Alterations..................................42
5.5   Performance of Other Agreements .............................................................42
5.6   Cooperate in Legal Proceedings ................................................................43
5.7   Further Assurances......................................................................................43
5.8   Environmental Matters................................................................................43
5.9   Title to the Property ....................................................................................45
5.10  Leases..........................................................................................................45
5.11  Estoppel Statement......................................................................................47
5.12  Property Management ..................................................................................47
5.13  Special Purpose Entity ................................................................................48
5.14  [Intentionally Omitted.] ..............................................................................48
5.15  Change in Business or Operation of Property.............................................48
5.16  Debt Cancellation........................................................................................48
5.17  Affiliate Transactions..................................................................................48
5.18  Zoning .........................................................................................................49
5.19  No Joint Assessment ...................................................................................49
5.20  Principal Place of Business .........................................................................49
5.21  Change of Name, Identity or Structure ......................................................49
5.22  Indebtedness................................................................................................49

5.23   License; Intellectual Property; Website ........................................49
5.24   Compliance with Restrictive Covenants .....................................50
5.25   ERISA ..........................................................................................50
5.26   Prohibited Transfers ...................................................................50
5.27   Liens .............................................................................................53
5.28   Dissolution ..................................................................................53
5.29   Expenses ......................................................................................53
5.30   Indemnity .....................................................................................54
5.31   Patriot Act Compliance ..............................................................55
5.32   Approval of Major Contracts ......................................................56
5.33   Franchise Agreement ..................................................................56
5.34   Hotel Operation ...........................................................................57

6.   NOTICES AND REPORTING..............................................................57

6.1   Notices ..........................................................................................57
6.2   Borrower Notices and Deliveries ................................................58
6.3   Financial Reporting .....................................................................58

7.   INSURANCE; CASUALTY; AND CONDEMNATION .......................61

7.1   Insurance ......................................................................................61
7.2   Casualty .......................................................................................64
7.3   Condemnation ..............................................................................65
7.4   Application of Proceeds or Award ..............................................66

8.   DEFAULTS ............................................................................................67

8.1   Events of Default .........................................................................67
8.2   Remedies ......................................................................................69

9.   SPECIAL PROVISIONS ........................................................................71

9.1   Sale of Mortgage and Securitization ..........................................71
9.2   Securitization Indemnification ...................................................74
9.3   Severance of Loan .......................................................................77
9.4   Costs and Expenses .....................................................................78

10.   MISCELLANEOUS ...............................................................................78

10.1   Exculpation .................................................................................78
10.2   Brokers and Financial Advisors ...............................................81
10.3   Retention of Servicer .................................................................81
10.4   Survival; Successors and Assigns ............................................81
10.5   Lender's Discretion; Rating Agency Review Waiver ...............82
10.6   Governing Law ...........................................................................82
10.7   Modification, Waiver in Writing ...............................................84

**Page**

10.8    Trial by Jury ................................................................................. 84
10.9    Headings/Schedules ....................................................................... 84
10.10   Severability .................................................................................. 84
10.11   Preferences ................................................................................... 84
10.12   Waiver of Notice ........................................................................... 85
10.13   Remedies of Borrower .................................................................... 85
10.14   Prior Agreements ........................................................................... 85
10.15   Offsets, Counterclaims and Defenses ............................................ 85
10.16   Publicity ....................................................................................... 86
10.17   No Usury ...................................................................................... 86
10.18   Conflict; Construction of Documents; Reliance .............................. 86
10.19   No Joint Venture or Partnership; No Third Party Beneficiaries ........ 87
10.20   Yield Maintenance Premium .......................................................... 87
10.21   Assignments and Participations ...................................................... 87
10.22   Intentionally Deleted ..................................................................... 88
10.23   Waiver of Marshalling of Assets .................................................... 88
10.24   Joint and Several Liability .............................................................. 88
10.25   Creation of Security Interest ........................................................... 88
10.26   Certain Additional Rights of Lender ............................................... 88
10.27   Set-Off .......................................................................................... 89
10.28   Counterparts .................................................................................. 89


Schedule 1      [not utilized]
Schedule 2      Exceptions to Representations and Warranties
Schedule 3      [not utilized]
Schedule 4      Organization of Borrower
Schedule 5      Definition of Special Purpose Entity
Schedule 6      Secondary Market Transaction Information
Schedule 7      Intellectual Property/Websites
Schedule 8      REA

# LOAN AGREEMENT

**LOAN AGREEMENT** dated as of June 10, 2015 (as the same may be modified, supplemented, amended or otherwise changed, this "*Agreement*") between **BEECHWOOD PLAZA HOTEL OF APPLETON, LLC**, a Wisconsin limited liability company (together with its permitted successors and assigns, "*Borrower*"), and **SOCIETE GENERALE** (together with its successors and assigns, "*Lender*").

## 1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**1.1    Specific Definitions**.  The following terms have the meanings set forth below:

*Acceptable Replacement Guarantor*:  one or more Persons that satisfy the criteria set forth in clauses (1) through (4) of the defined term "Qualified Transferees" for whom Lender shall have received a credit check reasonably acceptable to Lender and whose identity, experience, financial condition and creditworthiness is acceptable to Lender and that, in each case, (i) either Controls Borrower or owns a direct or indirect interest in Borrower and (ii) is otherwise reasonably acceptable to Lender in all respects.

*Affiliate*:  as to any Person, any other Person (i) which directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such Person; or (ii) which, directly or indirectly, beneficially owns or holds ten percent (10%) or more of any class of stock or any other ownership interest in such Person; or (iii) ten percent (10%) or more of the direct or indirect ownership of which is beneficially owned or held by such Person; or (iv) which directly or indirectly is a general partner, controlling shareholder, managing member, officer, director or trustee of such Person.

*Amortization Commencement Date*:  August 1, 2020, as such date may be changed in accordance with Section 2.2.5 hereof.

*Approved Capital/FF&E Expenses*:  the cost of FF&E Expenses and Capital Expenses incurred by Borrower, provided that during a Cash Management Period, such FF&E expenses or Capital Expenses shall either be (i) included in the Approved Capital Budget for the current calendar year or (ii) approved by Lender.  Room Refresh Expenses shall not constitute Approved Capital/FF&E Expenses.

*Approved Operating Expenses*: during a Cash Management Period, operating expenses incurred by Borrower that (i) are included in the Approved Operating Budget for the current calendar month, (ii) are for real estate taxes, insurance premiums, electric, gas, oil, water, sewer or other utility service to the Property, or (iii) are approved by Lender.

*Available Cash*:  as of each Payment Date during the continuance of Cash Management Period, the amount of Rents, if any, remaining in the Deposit Account after the application of all of the payments required under clauses (i) through (vii) of Section 3.10(a) hereof.

**Bankruptcy Code**: Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

**Bankruptcy Proceeding**:  with respect to any Person, (i) consenting in writing to the appointment of a conservator, receiver, trustee, custodian or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to it or of or relating to all, or substantially all, of its property, or for the winding-up or liquidation of its affairs, (ii) admitting in writing its inability to pay its debts generally as they become due or (iii) filing a petition, or otherwise instituting, or consenting in writing to the institution against it or, proceedings to take advantage of any law relating to bankruptcy, insolvency or reorganization or the relief of debtors under any federal, state or foreign bankruptcy, insolvency, receivership or similar law.

**Business Day**:  any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York are authorized or required to close.

**Calculation Date**:  the last day of each calendar quarter during the Term.

**Capital Expenses**:  expenses that are capital in nature or required to be capitalized under GAAP or other accounting system acceptable to Lender for purposes of Section 6.3 hereof. Capital Expenses shall include all FF&E expenses.

**Cash Management Period**:  shall commence upon Lender giving notice to the Clearing Bank, Borrower and Guarantor of the occurrence of any of the following: (i) the Stated Maturity Date, (ii) a Default or an Event of Default, (iii) the commencement of a Debt Service Sweep Period or (iv) the commencement of a Franchise Sweep Period; and shall end upon Lender giving notice to the Clearing Bank, Borrower and Guarantor that the sweeping of funds into the Deposit Account may cease, which notice Lender shall only be required to give if (1) the Loan and all other obligations under the Loan Documents have been repaid in full or (2) the Stated Maturity Date has not occurred and (A) with respect to the matters described in clause (ii) above, such Event of Default has been cured and no other Event of Default has occurred and is continuing or (B) with respect to the matter described in clause (iii) above, such Debt Service Sweep Period has ended or (C) with respect to the matter described in clause (iv) above, such Franchise Sweep Period has ended.

**Code**:  the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

**Control**:  with respect to any Person, either (i) ownership directly or indirectly of forty-nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms Controlled, Controlling and Common Control shall have correlative meanings.

**Debt**:  the unpaid Principal, all interest accrued and unpaid thereon, any Yield Maintenance Premium, and all other sums due to Lender in respect of the Loan or under any Loan Document.

**Debt Service**:  with respect to any particular period, scheduled Principal and interest payments due under the Note in such period.

**Debt Service Coverage Ratio**:  as of any date, the ratio calculated by Lender of (i) the actual Net Operating Income for the twelve (12)-month period ending with the most recently completed calendar month to (ii) the Debt Service with respect to such period.

**Debt Service Sweep Period**:  shall commence on the first Payment Date following Borrower's failure to replenish the Debt Service Reserve as required in Section 3.5.1 hereof, and shall end at such time as the amount on deposit in the Debt Service Reserve again equals the Minimum Amount.

**Default**:  the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

**Default Rate**:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Interest Rate, compounded monthly.

**Defeasance Collateral**:  U.S. Obligations, which provide payments (i) on or prior to, but as close as possible to, all Payment Dates and other scheduled payment dates, if any, under the Note after the Defeasance Date and up to and including the Permitted Prepayment Date, and (ii) in amounts equal to or greater than the Scheduled Defeasance Payments.

**Deposit Bank**:  Wells Fargo Bank, National Association, or such other bank or depository selected by Lender in its discretion.

**Eligible Account**:  a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (or subaccounts thereof) (A) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (B) if a Securitization has occurred, as to which Lender has received a Rating Comfort Letter from each of the applicable Rating Agencies with respect to holding funds in such account, or (ii) a segregated trust account or accounts (or subaccounts thereof) maintained with the corporate trust department of a federal depository institution or state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations §9.10(b), having in either case corporate trust powers, acting in its fiduciary capacity, and a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authorities.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

**Eligible Institution**: a depository institution insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1+ by Fitch, in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which

are rated at least (i) "AA" by S&P, (ii) "AA" and/or "F1+" (for securities) and/or "AAAmmf" (for money market funds), by Fitch and (iii) "Aa2" by Moody's; provided, however, for purposes of the Deposit Bank, the definition of Eligible Institution shall have the meaning set forth in the Deposit Account Agreement.

*Emergency Expenditures*: the incurrence of expenses that were necessary in order to (A) avoid imminent bodily injury, harm or damage to individuals or the Property, (B) avoid the suspension of any necessary service to the Property, or (C) comply with Legal Requirements, and, in each such case, with respect to which it would be impractical, in Borrower's reasonable judgment, under the circumstances, to obtain Lender's prior written consent; provided that Borrower shall give Lender notice of such Emergency Expenditures as soon as practicable.

*ERISA*: the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

*ERISA Affiliate*: means any trade or business (whether or not incorporated) which is a member of the same controlled group of corporations or group of trades or businesses under common control with Borrower or Guarantor, or is treated as a single employer together with Borrower or Guarantor under Section 414 of the Code or Title IV of ERISA.

*FF&E Expenses*: expenses that are for fixtures, furnishings, equipment, furniture, and other items of tangible personal property now or hereafter located in or on the Property or the Improvements or used in connection with the use, occupancy, operation and maintenance of all or any part of the hotel located on the Property, other than stocks of food and other supplies held for consumption in normal operation but including, without limitation, appliances, machinery, equipment, signs, artwork, office furnishings and equipment, guest room furnishings, and specialized equipment for kitchens, laundries, bars, restaurant, public rooms, health and recreational facilities, linens, dishware, all partitions, screens, awnings, shades, blinds, floor coverings, hall and lobby equipment, heating, lighting, plumbing, ventilating, refrigerating, incinerating, elevators, escalators, air conditioning and communication plants or systems with appurtenant fixtures, vacuum cleaning systems, call or beeper systems, security systems, sprinkler systems and other fire prevention and extinguishing apparatus and materials; reservation system computer and related equipment; all equipment, manual, mechanical or motorized, for the construction, maintenance, repair and cleaning of, parking areas, walks, underground ways, truck ways, driveways, common areas, roadways, highways and streets; and the Vehicles (as defined in the USALI).

*Fiscal Year*: each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the Term.

*Franchise Agreement*: collectively, that certain Hilton Garden Inn License Agreement dated April 26, 2000 and Supplemental Agreement to License Agreement dated concurrently therewith, between Franchisor, as franchisor, and Borrower, as franchisee, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement or any similar agreement entered into by and between Borrower and a Franchisor in accordance with the terms of the Loan Documents, pursuant to which

Borrower has the right to operate the hotel on the Property under a name and/or hotel system controlled by Franchisor.

> ***Franchise Sweep Period***:  the period which shall commence and end as hereinafter provided.

> A ***Franchise Sweep Period*** shall commence on the first Payment Date following the occurrence of any of the following:

>> (a)      on the date that is twelve (12) months before the expiration or termination date of the Franchise Agreement; or

>> (b)      on the date that Franchisor exercises any termination right it may have under the Franchise Agreement, or

>> (c)      on the date that Borrower exercises any termination right it may have under the Franchise Agreement; or

>> (d)      the Franchise Agreement is surrendered, cancelled or terminated prior to its then current expiration date; or

>> (e)      upon a default under the Franchise Agreement by the Borrower beyond any applicable notice and cure period.

> A ***Franchise Sweep Period*** shall end:

>> (i) with respect to clauses (a) through (d) above when the Franchise Agreement has been renewed or replaced by a new Franchise Agreement approved by Lender, and all costs incurred (including Lender's out-of-pocket costs) with respect to such renewal or replacement have been paid;

>> (ii) with respect to clause (e) above, when the applicable default has been cured; or

>> (iii) at any time that the balance in the Franchise Reserve Subaccount equals not less than $945,000.00.

> ***Franchisor***: HLT EXISTING FRANCHISE HOLDING LLC, a Delaware limited liability company, as successor in interest to Hilton Inns, Inc., a Delaware corporation, or any other franchisor engaged pursuant to a Franchise Agreement entered into in accordance with the terms and conditions of the Loan Documents.

> ***GAAP***:  generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

> ***Government Lists***:  (i) the Specially Designated Nationals and Blocked Persons Lists maintained by the Office of Foreign Assets Control ("***OFAC***"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Government

Lists", (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce, the United Nations, the European Union, any European Union member state or any other Governmental Authority or (iv) any similar lists maintained pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists".

*Governmental Authority*:  any court, board, agency, department, committee, commission, central bank, office or authority of any nature whatsoever (including any political subdivision or instrumentality thereof) for any governmental or quasi-governmental unit (whether federal, state, commonwealth, county, district, municipal, city, parish, provincial or otherwise) (whether of the government of the United States or any other nation) now or hereafter in existence (including any supra-national bodies such as the European Union or the European Central Bank and any intergovernmental organizations such as the United Nations).

*Guarantor*: individually, jointly and severally, Thomas D. Arnot, Darrell M. Hanson, or any other Person that now or hereafter guarantees any of Borrower's obligations hereunder or any other Loan Document.

*Hotel Transactions*:  occupancy arrangements for customary hotel transactions in the ordinary course of Borrower's business conducted at the hotel located at any Property, including nightly rentals (or licensing) of individual hotel rooms or suites, banquet room use and food and beverage services.

*Interest Period*:  (i) the period from the date hereof through the first day thereafter that is the last day of a calendar month and (ii) each period thereafter from the 1st day of each calendar month through the last day of each such calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date.  Notwithstanding the foregoing, if Lender exercises its right to change the Payment Date to a New Payment Date in accordance with <u>Section 2.2.5</u> hereof, then from and after such election, each Interest Period shall be the period from the New Payment Date in each calendar month through the day in the next succeeding calendar month immediately preceding the New Payment Date in such calendar month.

*Interest Rate*:  a rate of interest equal to 4.497% per annum(or, when applicable pursuant to this Agreement or any other Loan Document, the Default Rate).

*Inventory*: as defined in the UCC, and including items which would be entered on a balance sheet under the line items for "Inventories" or "china, glassware, silver, linen and uniforms" under USALI.

*Key Principal(s)*: Thomas D. Arnot and Darrell M. Hanson.

*Lease Termination Payments*:  (i) all fees, penalties, commissions or other payments made to Borrower above and beyond current amounts due under the Lease in connection with or relating to the rejection, buy-out, termination, surrender or cancellation of any Lease (including in connection with any Bankruptcy Proceeding) (a "***Termination Event***"), (ii) any security deposits or proceeds of letters of credit held by Borrower in lieu of cash security deposits, which Borrower retains pursuant to the applicable provisions of any Lease in connection with a

Termination Event, and (iii) any payments made to Borrower relating to unamortized tenant improvements and leasing commissions under any Lease in connection with a Termination Event.

*Leases*:  all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder.  As used herein, the term "Leases" shall not include Hotel Transactions.

*Legal Requirements*: statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities (including those regarding fire, health, handicapped access, sanitation, ecological, historic, zoning, environmental protection, wetlands and building laws and the Americans with Disabilities Act of 1990, Pub. L. No. 89-670, 104 Stat. 327 (1990), as amended, and all regulations promulgated pursuant thereto) affecting Borrower, any Loan Document or all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower, at any time in force affecting all or part of the Property.

*Lien*: any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

*Loan Documents*:  this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the date hereof:  (i) the Promissory Note made by Borrower to Lender in the aggregate principal amount equal to the Loan (the "*Note*"), (ii) the Mortgage, Assignment of Leases and Rents and Security Agreement made by Borrower in favor of Lender which covers the Property (the "*Mortgage*"), (iii) the Assignment of Leases and Rents from Borrower to Lender (the "*Assignment of Leases and Rents*"), (iv) the Assignment of Agreements, Licenses, Permits and Contracts from Borrower to Lender, (v) the Assigned Account Agreement (the "*Clearing Account Agreement*") among Borrower, Lender and the Clearing Bank, (vi) the Deposit Account Agreement (the "*Deposit Account Agreement*") among Borrower, Lender, Manager and the Deposit Bank and (vii) the Guaranty of Recourse Obligations made by Guarantor (the "*Guaranty*"); as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time (including pursuant to <u>Section 9.3</u> hereof).

**Major Contract**:   (i) any management, franchise or leasing agreement, (ii) any Hotel Transaction relating to future room reservations, which agreement (x) has a term of more than ninety (90) days and (y) covers more than ten (10) rooms (unless cancellable on thirty (30) days or less notice without requiring the payment of a termination fee or payments of any kind) or (iii) any cleaning, maintenance, service or other contract or agreement of any kind (other than Leases) of a material nature (materiality for these purposes to include, without limitation, contracts which extend beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind)).  Without limiting clause (ii) above, the term "**Major Contract**" shall not include Hotel Transactions.

**Management Agreement**:  the management agreement between Borrower and Manager, pursuant to which Manager is to manage the Property, as same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with Section 5.12 hereof.

**Manager**:  Beechwood Hotel Group, LLC, a Florida limited liability company, or any successor, assignee or replacement manager under the Management Agreement appointed by Borrower in accordance with Section 5.12 hereof.

**Material Alteration**: any alteration affecting structural elements of the Property the cost of which exceeds $217,100; provided, however, that in no event shall (i) any tenant improvement work performed pursuant to any Lease existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, (ii) alterations performed as part of a Restoration, or (iii) any replacement of furniture, fixtures and equipment in the ordinary course of business, constitute a Material Alteration.

**Maturity Date**:  the date on which the final payment of principal of the Note becomes due and payable as therein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

**Monthly Operating Expense Budgeted Amount**:  the monthly amount set forth in the Approved Operating Budget incurred or to be incurred for or as of the calendar month in which such Payment Date occurs.

**Net Operating Income**:  for any period, the actual net operating income of the Property for such period determined on a cash basis of accounting, after deducting therefrom deposits to (but not withdrawals from) any reserves and escrows required under this Agreement, and without giving credit for non-recurring extraordinary items of income.

**NRSRO**:  any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged by Lender or its designees in connection with, or in anticipation of, a Securitization.

**Officer's Certificate**:  a certificate delivered to Lender by Borrower which is signed by a senior executive officer of Borrower.

*Operations Agreements*:  the REA, and any other covenants, restrictions, easements, declarations or agreements of record relating to the construction, operation or use of the Property, together with all amendments, modifications or supplements thereto.

*Other Charges*:  all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

*Patriot Act*:  the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws

*Patriot Act Offense*:  any violation of the criminal laws of any Governmental Authority, or that would be a criminal violation if committed within the jurisdiction of the United States of America, any of the several states or any Governmental Authority, relating to terrorism or the laundering of monetary instruments, including any offense under (a) the criminal laws against terrorism; (b) the criminal laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or the (e) Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.

*Payment Date*:  the 1st day of each calendar month or, upon Lender's exercise of its right to change the Payment Date in accordance with Section 2.2.5 hereof, the New Payment Date (in either case, if such day is not a Business Day, the Payment Date shall be the first Business Day thereafter).  The first Payment Date hereunder shall be August 1, 2015.

*Permitted Encumbrances*: (i) the Liens created by the Loan Documents, (ii) all Liens and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes or Other Charges not yet due and payable and not delinquent, (iv) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within thirty (30) days after Borrower first receives written notice of such Lien and (v) such other title and survey exceptions as Lender approves in writing in Lender's discretion.

*Permitted Mezzanine Loan*:  a loan (i) by a third-party lender acceptable to Lender to a party that is not the Borrower, or (ii) in connection with a Transfer and Assumption, by Borrower to a party that is not the Transferee Borrower, that is in each case secured solely by a pledge of the membership interests in Borrower, provided that:

(A)    the loan-to-value ratio with respect to the combined principal balances of the Loan and such mezzanine loan shall not exceed seventy percent (70%) of the value of the Property as determined by an MAI appraisal in form and substance acceptable to Lender;

(B)    the debt service coverage ratio of the Property, calculated by Lender, of the projected combined regular Debt Service under the Loan and the regular debt service such mezzanine loan for the twelve (12) month period following the making of the mezzanine loan to the Net Operating Income of the Property for the twelve (12) month period ending with the then most recently completed calendar month, shall not be less than 1.30:1.00;

(C)     such mezzanine loan shall not be secured by or result in any pledge, encumbrance or assignment of the Property;

(D)     Borrower shall continue to be a Single Purpose Entity;

(E)     Borrower shall pay all cost and expense, including attorneys' fees and costs, incurred by Lender in connection with the mezzanine loan;

(F)     Borrower shall enter into such documentation as Lender may require in connection with such mezzanine loan and

(G)     such mezzanine loan shall be otherwise acceptable to Lender and subject to Lender's advance written approval.

*Permitted Prepayment Date*:  the Payment Date that occurs six (6) months prior to the Maturity Date.

*Permitted Transfers*:

(i)     a Lease entered into in accordance with the Loan Documents; or

(ii)     Hotel Transactions;

(iii)     a Permitted Encumbrance; or

(iv)     a Transfer and Assumption pursuant to Section 5.26.2 hereof; or

(v)     any Transfer in respect of, or of a direct or indirect interest in, any Person listed on a nationally or internationally recognized stock exchange or stock quotation system; or

(vi)     provided no Event of Default shall then exist, a Transfer of any direct or indirect interest in Borrower related to or in connection with the estate planning of such transferor to (1) an immediate family member of such interest holder (or to partnerships or limited liability companies Controlled solely by one or more of such family members) or (2) a trust established for the benefit of such immediate family member, provided that:

(A)     if such Transfer would cause the transferee, together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%), (x) Borrower shall provide to Lender twenty (20) days prior written notice thereof and (y) such transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in Borrower, shall be a Qualified Transferee;

(B)     such Transfer shall not otherwise result in a change of Control of Borrower or change of the day to day management and operations of the Property; and

(C)     Borrower shall continue to be a Special Purpose Entity; or

(vii)    a Transfer of any direct or indirect interest in Borrower that occurs by devise or bequest or by operation of law upon the death of a natural person that was the holder of such interest, provided that:

(A)     if such Transfer would cause the transferee, together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%) or to acquire direct or indirect Control of Borrower, (x) Borrower shall provide Lender with notice of such Transfer not less than thirty (30) days after the date of such Transfer and (y) such transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in Borrower, shall be a Qualified Transferee;

(B)     Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer not less than sixty (60) days after the date of such Transfer;

(C)     Borrower shall continue to be a Special Purpose Entity; and

(D)     if such Transfer results in a change of Control of Borrower to a Person other than (x) Key Principal (directly or indirectly) or (y) the estate of Key Principal (during the pendency of the settlement by the estate of Key Principal and if such Transfer occurs as a result of the death of Key Principal) (the "***Key Principal Estate***"): if such Transfer occurs (1) prior to the occurrence of a Securitization, such Transfer is approved by Lender in writing within thirty (30) days after any such Transfer, which approval shall not be unreasonably withheld; or

(viii)   provided that no Event of Default shall then exist, a Transfer of an interest in Borrower to any Person provided that:

(A)     such Transfer shall not (x) cause the transferee (other than Key Principal), together with its Affiliates, to acquire Control of Borrower or to acquire or to increase its direct or indirect interest in Borrower to an amount which equals or exceeds 49% or (y) result in Borrower no longer being Controlled by Key Principal;

(B)     if such Transfer would cause the transferee, together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%), (x) Borrower shall provide to Lender thirty (30) days prior written notice thereof and (y) such transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in Borrower, shall be a Qualified Transferee;

(C)     after giving effect to such Transfer, Key Principal shall continue to Control the day to day operations of Borrower and shall continue to own at least 41.48% of all equity interests (direct or indirect) of Borrower; and

(D)     Borrower shall continue to be a Special Purpose Entity; or

(ix)     provided that no Event of Default shall then exist, any other Transfer of a direct or indirect interest in Borrower provided that:

(A)     Borrower shall provide to Lender thirty (30) days prior written notice thereof;

(B)     Borrower shall continue to be a Special Purpose Entity;

(C)     if such Transfer would cause the transferee (other than Key Principal), together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%), such transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in Borrower, shall be a Qualified Transferee; and

(D)     if such Transfer shall cause (x) a change of Control of Borrower to a Person other than Key Principal or (y) the transferee (other than Key Principal), together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower to an amount which equals or exceeds forty-nine percent (49%), *then* Borrower shall deliver to Lender a transfer fee equal to 1.00% of the then unpaid Principal.

For purposes of <u>clause (v)</u> above, "immediate family member" shall mean a sibling, family trust, family limited partnership, parent, spouse, child (or step-child), grandchild or other lineal descendant of the interest holder.

As used in clauses (v) through (viii), "Transfer" shall mean the sale or conveyance of such interests (and not the encumbrance or pledge of such interests).

If any Transfer will result in Guarantor no longer owning a direct or indirect equity interest in Borrower (or otherwise receiving consideration to act as Guarantor), Guarantor shall (in connection with such Transfer) be replaced with an Acceptable Replacement Guarantor or another replacement guarantor acceptable to Lender in its sole discretion.  Such replacement guarantor(s) shall as a condition to such Transfer execute and deliver a guaranty of recourse obligations (in substantially the form as the Guaranty delivered to Lender by Guarantor on the date hereof) on or prior to the date of such Permitted Transfer (or, in the case of a Permitted Transfer described in <u>clause (vi)</u>, within thirty (30) days after the date of such Permitted Transfer), pursuant to which, in each case, such replacement guarantor(s) agree(s) to be liable under each such guaranty of recourse obligations from and after the date of such Permitted Transfer; whereupon Guarantor being replaced shall be released from any further liability under the Loan Documents to which it is a party from and after the date of such Transfer and such replacement guarantor(s) shall be a "Guarantor" for all purposes from and after the date of such Transfer.

***Person***:  any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

***Physical Conditions Report***:  that certain Property Condition Report, prepared by IVI Assessment Services, a CBRE Company and dated as of May 13, 2015.

**Plan**:  (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

**Pooling and Servicing Agreement**:  any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction.

**Property**: the parcel of real property and Improvements thereon owned by Borrower and encumbered by the Mortgage; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the Granting Clauses of the Mortgage and referred to therein as the Mortgaged Property.  The Property is located in Appleton/Village of Kimberly, Wisconsin.

**Qualified Transferee**:  a transferee for whom, prior to the Transfer, Lender shall have received evidence that the proposed transferee (1) has never been convicted of, or pled guilty or no contest to, a felony, (2) has never been indicted or convicted for, or pled guilty or no contest to, a Patriot Act Offense and is not on any Government List, (3) has never been the subject of a voluntary or involuntary (to the extent the same has not been discharged) Bankruptcy Proceeding and (4) has no material outstanding judgments or litigations or regulatory actions continuing or threatened against such proposed transferee or its interests.

**Rating Agency**:  prior to the final Securitization of the Loan (or if a Securitization has not occurred), each of Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("**S&P**"), Moody's Investors Service, Inc. ("**Moody's**"), Fitch, Inc., a division of Fitch Ratings Ltd. ("**Fitch**"), DBRS, Inc. and Morningstar, Inc. or any other nationally-recognized statistical rating organization which has been designated by Lender, and after the final Securitization of the Loan, any of the foregoing that have rated any of the securities issued in connection with the Securitization.

**Rating Comfort Letter**:  a letter issued by each of the applicable Rating Agencies which confirms that the taking of the action referenced to therein will not result in any qualification, withdrawal or downgrading of any existing ratings of Securities created in a Secondary Market Transaction.

**REA**:  that certain agreement more particularly described on <u>Schedule 8</u> attached hereto and made a part hereof, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

**Regulation AB**:  Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

**Regulation S-K**:  Regulation S-K of the Securities Act, as such regulation may be amended from time to time.

**Regulation S-X**:  Regulation S-X of the Securities Act, as such regulation may be amended from time to time.

***Regulatory Change***: at any time hereafter, (i) any change in any Legal Requirement (including by repeal, amendment or otherwise) or in the interpretation or application thereof by any central bank or other Governmental Authority or (ii) any new or revised request, guidance or directive issued by any central bank or other Governmental Authority and applicable to Lender.

***Related Loan***:  a loan to an Affiliate of Borrower or any Guarantor or secured by a Related Property, that is included in a Securitization with the Loan, and any other loan that is cross-collateralized with the Loan.

***Related Property***:  a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" (within the meaning of the definition of Significant Obligor) to the Property.

***Release Date***: the earlier to occur of (i) the thirtieth (30th) Payment Date of the Term and (ii) the date that is two (2) years from the "startup day" (within the meaning of Section 860G(a)(9) of the Code) of the REMIC Trust established in connection with the final Secondary Market Transaction involving this Loan.

***REMIC Trust***: a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

***Rents***:  all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all revenues and credit card receipts collected from guest rooms, restaurants, bars, telephone and internet services, television, meeting rooms, banquet rooms and recreational facilities, parking charges, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager or any of their agents or employees, or any operator or manager of the hotel or the commercial space located in the Improvements at any Property or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales, and proceeds, if any, from business interruption or other loss of income insurance, and all other items of revenue, receipts or other income as identified in the USALI.

***Scheduled Defeasance Payments***:  the Monthly Debt Service Payment Amount required under the Note for all Payment Dates occurring after the Defeasance Date together with payment in full of the outstanding Principal balance on the Note through the Permitted Prepayment Date.

**Security Agreement**: a security agreement in form and substance that would be satisfactory to Lender (in Lender's sole but good faith discretion) pursuant to which Borrower grants Lender a perfected, first priority security interest in the Defeasance Collateral Account and the Defeasance Collateral.

**Servicer**:  a servicer selected by Lender to service the Loan, including any "master servicer" or "special servicer" appointed under the terms of any Pooling and Servicing Agreement.

**SG**:  Societe Generale.

**Significant Obligor**:  has the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

**State**:  the state in which the Property is located.

**Stated Maturity Date**: July 1, 2025, as such date may be changed in accordance with Section 2.2.5 hereof.

**Survey**: a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

**Taxes**:  all real estate and personal property taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property.

**Term**:  the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

**Title Insurance Policy**:  the ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the Lien of the Mortgage.

**Transfer**:  (i) any sale, conveyance, transfer, encumbrance, pledge, lease or assignment, or the entry into any agreement to sell, convey, transfer, encumber, pledge, lease or assign, whether by law or otherwise, of, on, in or affecting (x) all or part of the Property (including any legal or beneficial direct or indirect interest therein), (y) any direct or indirect interest in Borrower (including any profit interest), or (ii) any change of Control of Borrower.

**UCC**:  the Uniform Commercial Code as in effect in the State or the state in which any of the Cash Management Accounts are located, as the case may be.

**USALI**:  Uniform System of Accounts for the Lodging Industry, 11th edition (or most current edition adopted by Borrower).

**U.S. Obligations**:  (a) securities evidencing an obligation to timely pay principal and/or interest that are direct obligations of the United States of America for the payment of which its full faith and credit is pledged, and that are not subject to prepayment, call or early redemption,

or (b) other obligations that are "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended (including but not limited to "government securities" (as so defined) issued by REFCOS, GNMA, FNMA, Freddie Mac, Farmers Home Administration, FHLMC, the Farm Credit System, FNMA, the Student Loan Marketing Association, the Financing Corp., the General Services Administration, U.S. Maritime Administration, U.S. Department of Housing and Urban Development, Federal Housing Administration, and the Washington Metropolitan Area Transit Authority) that are not subject to prepayment, call or early redemption and that are acceptable to the applicable Rating Agencies.

**Welfare Plan**:  an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

**Yield Maintenance Premium**:  an amount which, when added to the outstanding Principal, would be sufficient to purchase U.S. Obligations which provide payments (a) on or prior to, but as close as possible to, all successive scheduled payment dates under this Agreement through the Stated Maturity Date and (b) in amounts equal to the Monthly Debt Service Payment Amount and/or Monthly Interest Payment Amount, as the case may be, required under this Agreement through the Stated Maturity Date together with the outstanding principal balance of the Note as of the Stated Maturity Date assuming all such Monthly Debt Service Payment Amounts and/or Monthly Interest Payment Amounts, as the case may be, are made (including any servicing costs associated therewith).  In no event shall the Yield Maintenance Premium be less than zero.

      1.2    **Index of Other Definitions**.  The following terms are defined in the sections or Loan Documents indicated below:

"*Additional Operating Expense*" - 6.3.6

"*Annual Budget*" - 6.3.5

"*Applicable Taxes*" - 2.2.3

"*Approved Additional Operating Expense*" - 6.3.6

"*Approved Annual Budget*" - 6.3.5

"*Approved Capital Budget*" - 6.3.5

"*Approved Operating Budget*" - 6.3.5

"*Assignment of Leases and Rents*" - 1.1 (Definition of Loan Documents)

"*Award*" - 7.3.2

"*Borrower's Recourse Liabilities*" - 10.1

"*Broker*" - 10.2

"*Capital Reserve Subaccount*" - 3.4

"*Cash Collateral Subaccount*" - 3.8

"*Cash Management Accounts*" - 3.9

"*Casualty*" - 7.2.1

"*Casualty/Condemnation Prepayment*" - 2.3.2

"*Casualty/Condemnation Subaccount*" - 3.6

"*Cause*" - Schedule 5

"*Clearing Account*" - 3.1

"*Clearing Account Agreement*" - 1.1 (Definition of Loan Documents)

"*Clearing Bank*" - 3.1

"*Condemnation*" - 7.3.1

"*Defeasance Collateral Account*" - 2.3.3

"*Defeasance Event*" - 2.3.3

"*Defeasance Date*" - 2.3.3

"*Delaware Act*" - Schedule 5

"*Deposit Account*" - 3.1

"*Deposit Account Agreement*" - 1.1 (Definition of Loan Documents)

"*Disclosure Document*" - 9.2(a)

"*DSCR Cash Management Period*" - 1.1 (Definition of Cash Management Period)

"*Easements*" - 4.14

"*Embargoed Person*" - 5.31(c)

"*Endorsement*" - 5.26.2

"*Environmental Laws*" - 4.21

"*Equipment*" - Mortgage

"*Event of Default*" - 8.1

"*Exchange Act*" - 9.2(a)

"*Exchange Act Filing*" - 9.1(d)

"*Fitch*" - 1.1 (Definition of Rating Agency)

"*Guaranty*" - 1.1 (Definition of Loan Documents)

"*Hazardous Substances*" -  4.21

"*Improvements*" - Mortgage

"*Increased Costs*" - 2.2.4

"*Indemnified Liabilities*" - 5.30

"*Indemnified Party*" - 5.30

"*Insurance Premiums*" - 7.1.2

"*Insured Casualty*" - 7.2.2

"*Intellectual Property*" - 4.28

"*Issuer*" - 9.2(b)

"*Key Principal Estate*" - 1.1 (Definition of Permitted Transfers)

"*Late Payment Charge*" - 2.5.3

"*Lender's Consultant*" - 5.8.1

"*Liabilities*" - 9.2(b)

"*Licenses*" - 4.11

"*Loan*" - 2.1

"*Monthly Debt Service Payment Amount*" - 2.2.1

"*Monthly Interest Payment Amount*" - 2.2.1

"*Moody's*" - 1.1 (Definition of Rating Agency)

"*Mortgage*" - 1.1 (Definition of Loan Documents)

"*Nationally Recognized Service Company*" - Schedule 5

"*New Payment Date*" - 2.2.5

"*Note*" - 1.1 (Definition of Loan Documents)

"*Notice*" - 6.1

"*O & M Program*" - 5.8.3

"*OFAC*" - 1.1 (Definition of Government Lists)

"*Permitted Indebtedness*" - 5.22

"*Permitted Investments*" - Deposit Account Agreement

"*Policies*" - 7.1.2


"*Principal*" - 2.1

"*Proceeds*" - 7.2.2

"*Proposed Lease*" - 5.10.2

"*Qualified Carrier*" - 7.1.1

"*Remedial Work*" - 5.8.2

"*Required Records*" - 6.3.7

"*Restoration*" - 7.4.1

"*Review Waiver*" - 10.5

"*Rollover Reserve Subaccount*" - 3.5.1

"*S&P*" - 1.1 (Definition of Rating Agency)

"*Secondary Market Transaction*" - 9.1(a)

"*Securities*" - 9.1(a)

"*Securities Act*" - 9.2(a)

"*Securitization*" - 9.1(a)

"*Security Deposit Subaccount*" - 3.7

"*SG Group*" - 9.2(b)

"*Significant Casualty*" - 7.2.2

"*Special Purpose Entity*" - 5.13

"*Springing Recourse Event*" - 10.1

"*Subaccounts*" - 3.1

"*Successor Borrower*" - 2.3.3(c)

"*Tax and Insurance Subaccount*" - 3.3

"*Toxic Mold*" - 4.21

"*Transfer and Assumption*" - 5.26.2

"*Transferee Borrower*" - 5.26.2

"*Underwriter Group*" - 9.2(b)

"*Updated Information*" - 9.1(b)(i)

   **1.3** **Principles of Construction**.  Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

**2.** **GENERAL LOAN TERMS**

   **2.1** **The Loan**.  Subject to and upon the terms and conditions set forth herein, Lender is making a loan (the "***Loan***") to Borrower on the date hereof, in the original principal amount (the "***Principal***") of $10,855,000.00, which shall mature on the Stated Maturity Date. Borrower acknowledges receipt of the Loan, the proceeds of which are being and shall be used to (i) repay and discharge existing loans relating to the Property, (ii) fund certain of the Subaccounts, and (iii) pay transaction costs.  Any excess proceeds may be used for any lawful purpose. Borrower shall receive only one borrowing hereunder in respect of the Loan and no amount repaid in respect of the Loan may be reborrowed.  The Loan shall be evidenced by the Note and shall be repaid in accordance with the terms of this Agreement, the Note and the other Loan Documents.

   **2.2** **Interest; Monthly Payments**.

   **2.2.1** **Generally**.  From and after the date hereof, interest on the unpaid Principal shall accrue at the Interest Rate and be payable as hereinafter provided.  On the date hereof, Borrower shall pay interest on the unpaid Principal from the date hereof through and including June 30, 2015.  On August 1, 2015 and each Payment Date thereafter through and including the Payment Date immediately preceding the Amortization Commencement Date, Borrower shall pay interest on the unpaid Principal accrued at the Interest Rate during the Interest Period immediately preceding such Payment Date (the "***Monthly Interest Payment Amount***").  On the Amortization Commencement Date and each Payment Date thereafter for the remainder of the Term, Principal and interest thereon at the Interest Rate shall be payable in equal monthly

installments of $54,981.34 (the "***Monthly Debt Service Payment Amount***"); which is based on the Interest Rate and a 360-month amortization schedule.  The Monthly Debt Service Payment Amount due on any Payment Date shall first be applied to the payment of interest accrued during the preceding Interest Period and the remainder of such Monthly Debt Service Payment Amount shall be applied to the reduction of the unpaid Principal.  All accrued and unpaid interest and unpaid Principal shall be due and payable on the Maturity Date.  If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrower shall also pay interest that would have accrued on such repaid Principal to but not including the next Payment Date.

        2.2.2   **Default Rate**.  After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, calculated from the date such payment was due or such underlying Default shall have occurred without regard to any grace or cure periods contained herein, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

        2.2.3   **Taxes**.  Any and all payments by Borrower hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender by the law or regulation of any Governmental Authority (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to in this Section 2.2.3 as "***Applicable Taxes***").  If Borrower shall be required by law to deduct any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply:  (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.  Payments pursuant to this Section 2.2.3 shall be made within ten (10) days after the date Lender makes written demand therefor.

        2.2.4   **[intentionally omitted]**

        2.2.5   **New Payment Date.**  Lender shall have the right, to be exercised not more than once during the term of the Loan, to change the Payment Date to a date other than the first day of each month (a "***New Payment Date***"), on thirty (30) days' written notice to Borrower; provided, however, that any such change in the Payment Date: (i) shall not modify the amount of regularly scheduled monthly principal and interest payments, except that the first payment of principal and interest payable on the New Payment Date shall be accompanied by interest at the interest rate herein provided for the period from the Payment Date in the month in which the New Payment Date first occurs to the New Payment Date, (ii) shall change the Stated Maturity Date to the New Payment Date occurring in the month set forth in the definition of Stated Maturity Date and (iii) shall extend the Amortization Commencement Date to the New Payment Date occurring in the month set forth in the definition of Amortization Commencement Date.

2.3     **Loan Repayment**.

**2.3.1     Repayment**.  Borrower shall repay the entire outstanding principal balance of the Note in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents.  Borrower shall have no right to prepay or defease all or any portion of the Principal except in accordance with Sections 2.3.2 through 2.3.5 below.  Except during the continuance of an Event of Default, all proceeds of any repayment, including any prepayments of the Loan, shall be applied by Lender as follows in the following order of priority:  *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third*, to any other amounts then due and owing under the Loan Documents, including the Yield Maintenance Premium (if such repayment or prepayment occurs prior to the Permitted Prepayment Date).  If prior to the Stated Maturity Date the Debt is accelerated by reason of an Event of Default, then Lender shall be entitled to receive, in addition to the unpaid Principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Yield Maintenance Premium applicable to such Principal so accelerated.  During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed-in-lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

**2.3.2     Mandatory Prepayments**.  The Loan is subject to mandatory prepayment in certain instances of Insured Casualty or Condemnation (each a "***Casualty/Condemnation Prepayment***"), in the manner and to the extent set forth in Section 7.4.2 hereof.  Each Casualty/Condemnation Prepayment, after deducting Lender's costs and expenses (including reasonable attorneys' fees and expenses) in connection with the settlement or collection of the Proceeds or Award, shall be applied in the same manner as repayments under Section 2.3.1 above, and if such Casualty/Condemnation Prepayment is made on any date other than a Payment Date, then such Casualty/Condemnation Prepayment shall not include interest that would have accrued on the Principal prepaid to or including the next Payment Date.  Provided that no Event of Default is continuing, any such mandatory prepayment under this Section 2.3.2 shall be without the payment of the Yield Maintenance Premium.  Notwithstanding anything to the contrary contained herein, each Casualty/Condemnation Prepayment shall be applied in inverse order of maturity and shall not extend or postpone the due dates of the monthly installments due under the Note or this Agreement, or change the amounts of such installments.

**2.3.3     Intentionally Omitted**.

**2.3.4     Defeasance**.

(a)     **Conditions to Defeasance**.  Provided no Event of Default shall be continuing, Borrower shall have the right after the Release Date and prior to the Permitted Prepayment Date to voluntarily defease the entire amount of the Principal and obtain a release of the Lien of the Mortgage by providing Lender with the Defeasance Collateral (a "***Defeasance Event***"), subject to the satisfaction of the following conditions precedent:

(i)      Borrower shall give Lender not less than thirty (30) days prior written notice specifying a date (the "*Defeasance Date*") on which the Defeasance Event is to occur.

(ii)      Borrower shall pay to Lender (A) all payments of Principal and interest due on the Loan to and including the Defeasance Date and (B) all other sums, then due under the Note, this Agreement and the other Loan Documents;

(iii)      Borrower shall deposit the Defeasance Collateral into the Defeasance Collateral Account and otherwise comply with the provisions of subsections (b) and (c) of this Section 2.3.4;

(iv)      Borrower shall execute and deliver to Lender a Security Agreement in respect of the Defeasance Collateral Account and the Defeasance Collateral;

(v)      Borrower shall deliver to Lender an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions opining, among other things, that (A) Lender has a legal and valid perfected first priority security interest in the Defeasance Collateral Account and the Defeasance Collateral, and (B) if a Securitization has occurred, the REMIC Trust formed pursuant to such Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of a Defeasance Event pursuant to this Section 2.3.4;

(vi)      Borrower shall deliver to Lender and the Rating Agencies, at Borrower's sole expense, a Rating Comfort Letter as to the Defeasance Event (if required pursuant to a Pooling and Servicing Agreement from and after the occurrence of a Secondary Market Transaction);

(vii)      Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.3.4 have been satisfied;

(viii)      Borrower shall deliver a certificate of a nationally recognized public accounting firm acceptable to Lender certifying that (A) the Defeasance Collateral will generate monthly amounts equal to or greater than the Scheduled Defeasance Payments, (B) the revenue from the Defeasance Collateral will be applied within four (4) months of receipt towards payments of Debt Service, (C) the securities that comprise the Defeasance Collateral are not subject to prepayment, call or early redemption and (D) the interest income to Borrower (or the Successor Borrower, if applicable) from the Defeasance Collateral will not in any tax year exceed the interest expense associated with the defeased Loan;

(ix)      Borrower shall deliver such other certificates, opinions, documents and instruments as Lender may reasonably request; and

(x)      Borrower shall pay all costs and expenses of Lender incurred in connection with the Defeasance Event, including Lender's reasonable attorneys' fees and expenses.

(b)      **Defeasance Collateral Account**.  On or before the date on which Borrower delivers the Defeasance Collateral, Borrower shall open at any Eligible Institution the defeasance collateral account (the "***Defeasance Collateral Account***") which shall at all times be an Eligible Account.  The Defeasance Collateral Account shall contain only (i) Defeasance Collateral, and (ii) cash from interest and principal paid on the Defeasance Collateral.  All cash from interest and principal payments paid on the Defeasance Collateral shall be paid over to Lender on each Payment Date and applied first to accrued and unpaid interest and then to Principal.  Any cash from interest and principal paid on the Defeasance Collateral not needed to pay accrued and unpaid interest or Principal shall be retained in the Defeasance Collateral Account as additional collateral for the Loan.  Borrower shall cause the Eligible Institution at which the Defeasance Collateral is deposited to enter an agreement with Borrower and Lender, satisfactory to Lender in its sole discretion, pursuant to which such Eligible Institution shall agree to hold and distribute the Defeasance Collateral in accordance with this Agreement.  The Successor Borrower shall be the owner of the Defeasance Collateral Account and shall report all income accrued on Defeasance Collateral for federal, state and local income tax purposes in its income tax return.  Borrower shall prepay all cost and expenses associated with opening and maintaining the Defeasance Collateral Account.  Lender shall not in any way be liable by reason of any insufficiency in the Defeasance Collateral Account.

(c)      **Successor Borrower**.  In connection with a Defeasance Event under this Section 2.3.4, Borrower shall designate an Affiliate of Lender or, at Borrower's option, an Affiliate of Borrower, as a successor entity (the "***Successor Borrower***") which shall be a Special Purpose Entity.  Pursuant to an assumption agreement in form and substance satisfactory to Lender in its sole discretion, Borrower shall transfer and assign all obligations, rights and duties under and to the defeased Note, together with the Defeasance Collateral to such Successor Borrower.  Such Successor Borrower shall assume the obligations under the Note and the Security Agreement and Borrower shall be relieved of its obligations under such documents.  Borrower shall pay $1,000 to any such Successor Borrower as consideration for assuming the obligations under the Note and the Security Agreement.  As a condition to such assignment and assumption, Borrower shall deliver to Lender an opinion of counsel in form and substance and delivered by counsel satisfactory to Lender in its sole discretion stating, among other things, that such assumption agreement is enforceable against Borrower and such successor entity in accordance with its terms and that the Note and the Security Agreement, as so assumed, are enforceable against such successor entity in accordance with their respective terms.  Borrower shall pay all costs and expenses incurred by Lender, including Lender's attorney's fees and expenses, incurred in connection therewith.

(d)      **Purchase of Defeasance Collateral**.  Upon the defeasance of the Loan in accordance with clauses (a), (b) and (c) of this Section 2.3.4, Borrower shall have no further right to prepay the Note pursuant to the other provisions of this Section 2.3.4 or otherwise.  Borrower shall pay any and all expenses incurred in the purchase of the Defeasance Collateral and any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of this Section 2.3.4.

**2.3.5   Optional Prepayments**.  After the Release Date and prior to the Permitted Prepayment Date, Borrower may defease the Loan in accordance with Section 2.3.4.

From and after the Permitted Prepayment Date, Borrower shall have the right to prepay the Loan in whole (but not in part), provided that Borrower gives Lender at least fifteen (15) days' prior written notice thereof.  If any such prepayment is not made on a Payment Date, Borrower shall also pay interest that would have accrued on such prepaid Principal to, but not including, the next Payment Date.  Any such prepayment shall be made without payment of the Yield Maintenance Premium.

### 2.4    **Release of Property**.

**2.4.1    Release on Defeasance**.  If Borrower has elected to defease the Note and the requirements of Section 2.3.4 above and this Section 2.4 have been satisfied, the Property shall be released from the Lien of the Mortgage and the Defeasance Collateral pledged pursuant to the Security Agreement shall be the sole source of collateral securing the Note.  In connection with the release of the Lien, Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date (or such shorter time as is acceptable to Lender in its sole discretion), a release of Lien (and related Loan Documents) for execution by Lender.  Such release shall be in a form appropriate in the jurisdiction in which the Property is located and contain standard provisions protecting the rights of the releasing lender.  In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement.  Borrower shall pay all costs, taxes and expenses associated with the release of the Lien of the Mortgage, including Lender's reasonable attorneys' fees.  Borrower, pursuant to the Security Agreement, shall authorize and direct that the payments received from Defeasance Collateral be made directly to Lender and applied to satisfy the obligations under the Loan Documents, including payment in full of the unpaid Principal as of the Permitted Prepayment Date.  Any funds remaining after application of the Defeasance Collateral purchased by Borrower and not all applied to Defeasance shall be refunded to Borrower.

**2.4.2    Release on Payment in Full**.  Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, release or, if requested by Borrower, assign to Borrower's designee (without any representation or warranty by and without any recourse against Lender whatsoever), the Lien of the Loan Documents if not theretofore released.  In connection with the release of the Lien, Borrower shall submit to Lender, not less than thirty (30) days prior to the date of repayment (or such shorter time as is acceptable to Lender in its sole discretion), a release of Lien (and related Loan Documents) for execution by Lender.  Such release shall be in a form appropriate in the jurisdiction in which the Property is located and contain standard provisions protecting the rights of the releasing lender. In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement.  Borrower shall pay all costs, taxes and expenses associated with the release of the Lien of the Mortgage, including Lender's reasonable attorneys' fees.  Upon Defeasance or payment of the Debt in full and release of the Mortgage, Lender shall return to Borrower all amounts remaining on deposit in reserve accounts under this Agreement by wire transfer within five (5) Business Days thereafter at no additional charge to Borrower.

2.5    **Payments and Computations**.

2.5.1    **Making of Payments**.  Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 2:00 p.m., New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower. Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the first Business Day thereafter.  All such payments shall be made irrespective of, and without any deduction, set-off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

2.5.2    **Computations**.  Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360-day year.

2.5.3    **Late Payment Charge**.  If any Principal or interest due under any Loan Document is not paid by Borrower within five (5) days of the date on which it is due; or if any or other sum due under any Loan Document is not paid by Borrower within five (5) days of the date on which it is due, subject to any applicable grace or cure period, if any, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law (the "*Late Payment Charge*"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Such amount shall be secured by the Loan Documents.

3.    **CASH MANAGEMENT AND RESERVES**

3.1    **Cash Management Arrangements**.    Borrower shall cause all Rents (including Rents in the nature of sums payable by issuers of credit cards accepted at the Property) to be transmitted directly into an Eligible Account (the "*Clearing Account*") maintained by Borrower at a local bank selected by Borrower, which shall at all times be an Eligible Institution (the "*Clearing Bank*") as more fully described in the Clearing Account Agreement.  Without in any way limiting the foregoing, if Borrower or Manager receive any Rents, then (i) such amounts shall be deemed to be collateral for the Loan and shall be held in trust for the benefit, and as the property, of Lender, (ii) such amounts shall not be commingled with any other funds or property of Borrower or Manager, and (iii) Borrower or Manager shall deposit such amounts into the Clearing Account within three (3) Business Days of receipt.  Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into Borrower's operating account at the Clearing Bank, unless a Cash Management Period is continuing, in which event such funds shall be swept on a daily basis into an Eligible Account at the Deposit Bank controlled by Lender (the "*Deposit Account*") and applied and disbursed in accordance with this Agreement.  Funds in the Deposit Account shall be invested at Lender's discretion only in Permitted Investments. Lender will also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "*Subaccounts*").  The Deposit Account and any Subaccount will be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal

therefrom.  Borrower shall pay for all reasonable expenses of opening and maintaining all of the above accounts.

3.2     **Intentionally Omitted**.


3.3     **Taxes and Insurance**.  Borrower shall pay to Lender (i) $12,833.33 on the date hereof on account of Taxes, (ii) $29,381.92 on the date hereof on account of Insurance Premiums, and (iii) on each Payment Date, (x) one-twelfth (1/12th) of the Taxes that Lender estimates will be payable during the next twelve (12) months (initially $12,833.33 per month) in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (y) one-twelfth (1/12th) of the Insurance Premiums that Lender estimates will be payable (initially $2,671.08 per month) for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies.   Such amounts will be transferred by Lender to a Subaccount (the "***Tax and Insurance Subaccount***").   Provided that no Default or Event of Default has occurred and is continuing, Lender will (a) apply funds in the Tax and Insurance Subaccount to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.2 hereof and Section 7.1 hereof, provided that Borrower has promptly supplied Lender with notices of all Taxes and Insurance Premiums due, or (b) reimburse Borrower for such amounts upon presentation of evidence of payment; subject, however, to Borrower's right to contest Taxes in accordance with Section 5.2 hereof.  In making any payment relating to Taxes and Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If Lender determines in its reasonable judgment that the funds in the Tax and Insurance Subaccount will be insufficient to pay (or in excess of) the Taxes or Insurance Premiums next coming due, Lender may increase (or decrease) the monthly contribution required to be made by Borrower to the Tax and Insurance Subaccount.  At Borrower's request, Lender will make full payment of annual real estate taxes in the year they are incurred to take full advantage of any present or future discounts to taxes provided that sufficient amounts are reserved for the applicable tax year.

3.4     **Capital Expense Reserves**.

(a)     Borrower shall pay to Lender (i) $12,555.16 on the date hereof and (ii) on each Payment Date an amount initially equal to one-twelfth of 4% of the annual hotel revenue (based on the prior year) and Lender will transfer such amounts (the "***Capital Expense/FF&E Reserves***") into a Subaccount (the "***Capital/FF&E Expense Subaccount***"). Notwithstanding the foregoing to the contrary, Borrower shall have the right to request that Lender recalculate the Capital Expense/FF&E Reserves based on the trailing twelve (12) month hotel revenue, as the basis for calculating the Capital Expense/FF&E Reserves, no more than four (4) times during the length of the Loan term. .

(b)      Provided that no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Capital Reserve Subaccount to Borrower, within seven (7) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000 provided that (i) such disbursement is for an Approved Capital/FF&E Expense; (ii) Lender shall have (if it desires and an individual item exceeds $100,000) verified (by an inspection conducted at Borrower's expense in an amount not to exceed $1,500 per inspection) performance of the work associated with such Approved Capital/FF&E Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (1) that such funds will be used to pay or reimburse Borrower for Approved Capital/FF&E Expenses and a description thereof, (2) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (3) that the same has not been the subject of a previous disbursement, and (4) that all previous disbursements have been used to pay the previously identified Approved Capital/FF&E Expenses, and (B) lien waivers or other evidence of payment reasonably satisfactory to Lender, and (C) at Lender's option, for amounts exceeding $100,000, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender.

### 3.5    Debt Service Reserve/Franchise Reserve.

**3.5.1 Debt Service Reserve.**  Borrower shall pay to Lender $109,962.69, on the date hereof, which is an amount equal to the equivalent of two months' Debt Service. Lender will transfer such amount into a Subaccount (the "***Debt Service Reserve Subaccount***"). In the event that the Net Cash Flow of the Property in any calendar month is insufficient to pay the Debt Service next due, provided no Event of Default is continuing, Borrower may request that Lender disburse from the Debt Service Reserve Subaccount an amount to pay Debt Service equal to the shortfall in Net Cash Flow then available for Debt Service.  If Lender applies funds in the Debt Service Reserve Subaccount to pay Debt Service, on the next occurring Payment Date Borrower shall deposit with Lender an amount sufficient to replenish the Debt Service Reserve Subaccount up to a maximum amount of two (2) months' Debt Service.  On each Payment Date during the continuance of a Debt Service Sweep Period, all Available Cash, up to a maximum amount of two (2) months' Debt Service, shall be paid to Lender for deposit into the Debt Service Reserve Subaccount.

**3.5.2 Franchise Reserve.**

(a)      On each Payment Date occurring during the continuance of a Franchise Sweep Period (provided no Cash Management Period is then continuing other than a Cash Management Period triggered solely as a result of a Franchise Sweep Period), all Available Cash (or such portion of Available Cash that shall be allocated by Lender for deposit into the Franchise Reserve Subaccount) shall be paid to Lender.  Lender will transfer such amount into a Subaccount (the "***Franchise Reserve Subaccount***"). If any event shall occur that will cause a Franchise Sweep Period to commence as provided in the definition of "Franchise Sweep Period" above, the Franchise Sweep Period shall not commence if Borrower deposits into the Franchise Reserve a sum sufficient to cause the balance in the Franchise Reserve Subaccount to be not less than $945,000.00 on or before the first Payment Date following the occurrence of such event.

(b)      Provided that no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Franchise Reserve Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of evidence reasonably satisfactory to Lender that the Franchise Agreement has been renewed or replaced by a new Franchise Agreement approved by Lender and all costs with respect to such renewal or replacement have been paid and/or the applicable default under the Franchise Agreement that triggered the Franchise Sweep Period has been cured.

**3.6      Casualty/Condemnation Subaccount**.  Borrower shall pay, or cause to be paid, to Lender all Proceeds or Awards due to any Casualty or Condemnation to be transferred to a Subaccount (the "*Casualty/Condemnation Subaccount*") in accordance with the provisions of Article 7 hereof.  All amounts in the Casualty/Condemnation Subaccount shall be disbursed in accordance with the provisions of Article 7 hereof.

**3.7      Security Deposits**.  Borrower shall keep and hold all security deposits under Leases in accordance with applicable Legal Requirements and at a separately designated account under Borrower's control at the Clearing Bank (and in the case of a letter of credit, assigned with full power of attorney and executed sight drafts to Lender) so that the security deposits shall not be commingled with any other funds of Borrower.  During a Cash Management Period, Borrower shall, upon Lender's request, if permitted by applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) under Leases, to be held by Lender in a Subaccount (the "*Security Deposit Subaccount*") subject to the terms of the Leases.  Security deposits held in the Security Deposit Subaccount will be released by Lender upon notice from Borrower together with such evidence as Lender may reasonably request that such security deposit is required to be returned to a tenant pursuant to the terms of a Lease or may be applied as Rent pursuant to the rights of Borrower under the applicable Lease.  Any letter of credit or other instrument that Borrower receives in lieu of a cash security deposit under any Lease entered into after the date hereof shall (i) be maintained in full force and effect in the full amount unless replaced by a cash deposit as hereinabove described and (ii) if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender).

**3.8      Cash Collateral Subaccount**.  If a Cash Management Period shall have commenced(other than a Cash Management Period triggered solely as a result of a Debt Service Sweep Period or a Franchise Sweep Period), then on the immediately succeeding Payment Date and on each Payment Date thereafter during the continuance of such Cash Management Period, all Available Cash shall be paid to Lender, which amounts shall be transferred by Lender into a Subaccount (the "*Cash Collateral Subaccount*") as cash collateral for the Debt.  Notwithstanding the foregoing, if a Debt Service Sweep Period or a Franchise Sweep Period has occurred and is then continuing during the continuance of any Cash Management Period (other than a Cash Management Period triggered solely as a result of a Debt Service Sweep Period or a Franchise Sweep Period), Lender shall have the right (but not the obligation) to allocate any funds in the Cash Collateral Subaccount to the Debt Service Subaccount to be held and disbursed in accordance with the terms and conditions of Section 3.5.1 hereof and/or the Franchise Reserve Subaccount to be held and disbursed in accordance with the terms and conditions of Section 3.5.2, as applicable.  Any funds in the Cash Collateral Subaccount and not previously disbursed or applied shall be disbursed to Borrower upon the termination of such Cash Management Period.  Lender shall have

the right, but not the obligation, at any time during the continuance of an Event of Default, in its sole and absolute discretion to apply all sums then on deposit in the Cash Collateral Subaccount to the Debt, in such order and in such manner as Lender shall elect in its sole and absolute discretion, including to make a prepayment of Principal (together with the applicable Yield Maintenance Premium).

**3.9** **Grant of Security Interest; Application of Funds**.  As security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all Borrower's right, title and interest in and to all Rents and in and to all payments to or monies held in the Clearing Account, the Deposit Account and all Subaccounts created pursuant to this Agreement (collectively, the "*Cash Management Accounts*").  Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Rents in its possession prior to the (i) payment of such Rents to Lender or (ii) deposit of such Rents into the Deposit Account.  Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.  This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC.  Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Cash Management Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of the Mortgage or exercise its other rights under the Loan Documents.  Cash Management Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  Provided no Event of Default is continuing, all interest which accrues on the funds in all Cash Management Accounts shall accrue for the benefit of Borrower at the maximum rate available to Servicer and shall be taxable to Borrower and shall be added to and disbursed in the same manner and under the same conditions as the principal sum on which said interest accrued.  Upon repayment in full of the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower.

**3.10** **Property Cash Flow Allocation**.

(a)      During any Cash Management Period, all Rents deposited into the Deposit Account during the immediately preceding Interest Period shall be applied on each Payment Date as follows in the following order of priority:

(i)      First, to make payments into the Tax and Insurance Subaccount to the extent required under Section 3.3 hereof;

(ii)      Second, to Lender to pay the Monthly Debt Service Payment Amount or the Monthly Interest Payment Amount, as the case may be, due on such Payment Date (plus, if applicable, interest at the Default Rate and all other amounts, other than those described under other clauses of this Section 3.10(a), then due to Lender under the Loan Documents);

(iii)    Third, funds in an amount equal to the Monthly Operating Expense Budgeted Amount and any then-current Approved Additional Operating Expenses shall be disbursed to Borrower (or to an account designated by Borrower);

(iv)    Fourth, to pay the monthly portion of the fees charged by the Deposit Bank in accordance with the Deposit Account Agreement;

(v)    Fifth, to make payments into the Capital Reserve Subaccount as required under Section 3.4 hereof; and

(vi)    Lastly, to make payments in an amount equal to all Available Cash on such Payment Date:

(A)    during the continuance of a Cash Management Period continuing solely as a result of a Debt Service Sweep Period, into the Debt Service Reserve Subaccount in accordance with Section 3.5.1 hereof; or

(B)    during the continuance of a Cash Management Period continuing solely as a result of a Franchise Sweep Period, so long as no Debt Service Sweep Period is then continuing, into Franchise Reserve Subaccount in accordance with Section 3.5.2 hereof; or

(C)    otherwise, into the Cash Collateral Subaccount in accordance with Section 3.8 hereof.

(b)    The failure of Borrower to make all of the payments required under clauses (i) through (vii) above in full on each Payment Date shall constitute an Event of Default under this Agreement; provided, however, if adequate funds are available in the Deposit Account for such payments, the failure by the Deposit Bank to allocate such funds into the appropriate Subaccounts shall not constitute an Event of Default.

(c)    Notwithstanding anything to the contrary contained in this Section 3.10 or elsewhere in the Loan Documents, after the occurrence of a Default or an Event of Default, Lender may apply all Rents deposited into the Deposit Account and other proceeds of repayment in such order and in such manner as Lender shall elect.  Lender's right to withdraw and apply any of the foregoing funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

## 3.11    Room Refresh Reserve.

(a)    Borrower shall pay to Lender $150,000 on the date hereof, which Lender shall transfer to a Subaccount (the "R*efresh Reserve Subaccount*").  The funds in the Room Refresh Reserve Subaccount shall be referred to as the "***Refresh Funds.***"  The Refresh Funds shall be used solely to pay the costs of the Refresh Work.  The "***Refresh Work***" means the renovation of the guest rooms at the Property sufficient to meet Franchisor's current guest room standards and as such work has been approved in writing by Franchisor.  Promptly following

Franchisee approval of the Refresh Work, Borrower shall diligently pursue the Refresh Work to completion in a good and workmanlike manner, lien-free and in accordance with applicable Legal Requirements.

(b)     Provided no Default or Event of Default shall have occurred and is continuing, Lender shall disburse funds held in the Refresh Reserve Subaccount to Borrower, within ten (10) days after the delivery by Borrower to Lender of a request therefor, with each disbursement in the amount of $50,000, accompanied by the following items (which items shall be in form and substance reasonably satisfactory to Lender): an Officer's Certificate (A) certifying that Refresh Work (defined below) has been completed in a good and workmanlike manner, lien-free and in accordance with all applicable Legal Requirements, (B) stating that the cost of such completed Refresh Work equals or exceeds $200,000, (C) identifying each Person that supplied materials or labor in connection with such Refresh Work or any portion thereof, and (D) stating that each such Person has been paid in full with respect to such Refresh Work from funds in the Supplemental Refresh Account (defined below) or other funds of Borrower, with copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender.  The final $50,000 on deposit in the Refresh Reserve Subaccount may be disbursed only at such time as Lender has received reasonably satisfactory evidence that the Refresh Work is complete (including Franchisor's written acknowledgement of completion), Borrower has satisfied the disbursement conditions stated above, including without limitation that Lender shall have received copies of appropriate checks and invoices or other evidence of payment reasonably satisfactory to Lender with respect to all of the Refresh Work and, at Lender's option, Lender has inspected and approved the Refresh Work.

(c)     In the event that funds are deposited into the Refresh Reserve Subaccount from the Supplemental Refresh Account as provided in Section 3.13 below, provided no Default or Event of Default shall have occurred and is continuing, Lender shall disburse such to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $2,500, accompanied by the following items (which items shall be in form and substance satisfactory to Lender): (i) an Officer's Certificate (A) certifying that the Refresh Work or any portion thereof which are the subject of the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) identifying each Person that supplied materials or labor in connection with such Refresh Work and (C) stating that each such Person has been paid in full with respect to such Refresh Work that is the subject of the requested disbursement; and (ii) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender.  Provided no Default or Event of Default shall have occurred and is continuing, upon Borrower's completion of all Refresh Work and all other conditions to final disbursement under subsection (b) above have been satisfied, Lender shall release to Borrower any such funds remaining in the Refresh Reserve Subaccount.

(d)     Borrower shall pay or reimburse Lender for all reasonable out-of-pocket costs incurred by Lender in connection with the Refresh Reserve Subaccount and the Refresh Work.

3.12    **Supplemental Refresh Account**.  On the date hereof, Borrower shall have established a deposit account at an Eligible Institution that is an Eligible Account (the

"*Supplemental Refresh Account*") and into which Borrower shall deposit on the date hereof the sum of $450,000 (the "*Supplemental Refresh Funds*").  Borrower grants to Lender a first priority security interest in such deposit account, all funds therein and all proceeds thereof.  Lender shall at all times have a perfected first priority security interest in the Supplemental Refresh Account. The Supplemental Refresh Funds shall be used solely to pay the expenses of the Refresh Work.  If Lender has not received from Borrower within 30 months after the date hereof evidence demonstrating that the Refresh Work is complete, without any further notice from Lender but in any case within 10 days after written demand by Lender, Borrower shall transfer all funds remaining in the Supplemental Refresh Account to Lender for deposit in the Refresh Reserve Subaccount.

## 4.    REPRESENTATIONS AND WARRANTIES

To the best of Borrower's knowledge, Borrower represents and warrants to Lender as of the date hereof that, except to the extent (if any) disclosed on Schedule 2 hereto with reference to a specific Section of this Article 4:

### 4.1    Organization; Special Purpose.

(a)    Borrower is duly organized, validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged.  Borrower is duly qualified to do business and is in good standing in the jurisdiction in which the Property is located and in each other jurisdiction where it is required to be so qualified in connection with its properties, business and operations.

(b)    Borrower has at all times since its formation been, and as of the date hereof is, a Special Purpose Entity.

### 4.2    Proceedings; Enforceability.  Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents by it, and has the power and authority to execute, deliver and perform under the Loan Documents and all the transactions contemplated thereby.  The Loan Documents have been duly authorized, executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and none of Borrower or Guarantor have asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

### 4.3    No Conflicts.  The execution, delivery and performance of the Loan Documents by Borrower and the transactions contemplated hereby will not conflict with any

provision of any law or regulation to which Borrower is subject, or conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties.  Borrower's rights under the Licenses, the Franchise Agreement and the Management Agreement will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's performance thereunder, the recordation of the Mortgage, or the exercise of any remedies by Lender.  Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, the Loan Documents or the consummation of the transactions contemplated hereby, has been obtained and is in full force and effect.

        **4.4**    **Litigation**.  There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened against or affecting Borrower, Guarantor, Manager or the Property, in any court or by or before any other Governmental Authority, which, if adversely determined, might materially or adversely affect the condition (financial or otherwise) or business of Borrower (including the ability of Borrower to carry out its obligations under the Loan Documents), Guarantor, Manager or the use, value, condition or ownership of the Property.

        **4.5**    **Agreements**.  Borrower is not a party to any agreement or instrument or subject to any restriction which might materially or adversely affect Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would materially or adversely affect the condition (financial or other) or operations of Borrower or its properties or might have consequences that would adversely affect its performance hereunder. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound.

        **4.6**    **Title**.  Borrower has good, marketable and indefeasible title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid or are being paid simultaneously herewith. The Mortgage when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on Borrower's interest in the Property and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances.  All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with

the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Mortgage, have been paid or are being paid simultaneously herewith.  All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Insurance Policy.  No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.  There are no mechanics', materialman's or other similar Liens or claims which have been filed for work, labor or materials affecting the Property which are or may become a Lien prior to, or equal or coordinate priority with, the Liens created by the Loan Documents.  There are no outstanding options to purchase or rights of first refusal affecting all or any portion of the Property.  All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property, except those which are set forth on the Survey and insured against by the Title Insurance Policy.  Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property.  There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

      **4.7**     **No Bankruptcy Filing**.  Neither Borrower nor any of its constituent Persons have filed, or are contemplating the filing of, a Bankruptcy Proceeding, and Borrower has no knowledge of any Person having filed, or contemplating the filing of, a Bankruptcy Proceeding against it or such constituent Persons.  In addition, neither Borrower nor any principal nor Affiliate of Borrower has been a party to, or the subject of a Bankruptcy Proceeding for the past ten (10) years.

      **4.8**     **Full and Accurate Disclosure**.  No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading.  There is no material fact presently known to Borrower that has not been disclosed to Lender which adversely affects, or, as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.  All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP or other accounting system reasonably acceptable to Lender, consistently applied throughout the periods covered, except as disclosed therein.  Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement.  Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

**4.9**     **Tax Filings**.  To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state, commonwealth, district and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state, commonwealth, district and local taxes, charges and assessments payable by Borrower. Borrower's tax returns (if any) properly reflect the income and taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**4.10**     **ERISA; No Plan Assets**.  As of the date hereof and throughout the Term (i) Borrower, Guarantor or any ERISA Affiliate do not sponsor, are not obligated to contribute to, and are not themselves an "employee benefit plan," as defined in Section 3(3) of ERISA or Section 4975 of the Code, (ii) none of the assets of Borrower or Guarantor constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA, (iii) Borrower and Guarantor are not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Borrower or Guarantor are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.  As of the date hereof, neither Borrower, Guarantor nor any ERISA Affiliate maintains, sponsors or contributes to, or has any obligations with respect to, a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA). Neither Borrower nor Guarantor has engaged in any transaction in connection with which it could be subject to either a material civil penalty assessed pursuant to the provisions of Section 502 of ERISA or a material tax imposed under the provisions of Section 4975 of the Code.

**4.11**     **Compliance**.  Borrower and the Property (including the Improvements) and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking, building and applicable zoning and land use laws, codes, regulations and ordinances).  Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower.   Borrower has not committed any act which may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. The Property is used exclusively for hotel/hospitality use and other appurtenant and related uses.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  No legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property. All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required of Borrower for the legal use, occupancy and operation of the Property for its current use (collectively, the "*Licenses*"), have been obtained and are in full force and effect.  The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

**4.12    Major Contracts**.  Borrower has not entered into, or is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender.  Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to the best knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto.  None of Borrower, Manager or any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.  Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.  Except for Manager under the Management Agreement, no Major Contract has as a party an Affiliate of Borrower.

**4.13    Federal Reserve Regulations; Investment Company Act; Bank Holding Company**.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document.  Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal, state or foreign law or regulation which purports to restrict or regulate its ability to borrow money. Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**4.14    Easements; Utilities and Public Access**.  To Borrower's knowledge, all easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, "***Easements***"), if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Insurance Policy and are in full force and effect without default thereunder.  The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses.  All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid irrevocable easement.  All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

**4.15    Physical Condition**.  Except as may be expressly set forth in the Physical Conditions Report, the Property, including all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages to the Property, whether latent or otherwise.  Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or any termination or threatened termination of any policy of insurance or bond.  No portion of the Property is located in an area as identified by the Federal Emergency

Management Agency as an area having special flood hazards, or, if so located the flood insurance required pursuant to <u>Section 7.1.1</u> hereof is in full force and effect with respect to the Property. The Improvements have suffered no material casualty or damage which has not been fully repaired and the cost thereof fully paid.

### 4.16   <u>Intentionally Omitted.</u>

### 4.17   <u>Fraudulent Transfer</u>.  Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total probable liabilities, including subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of Borrower's assets is, and immediately following the making of the Loan, will be, greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower).

### 4.18   <u>Ownership of Borrower</u>.  Borrower's exact legal name is: BEECHWOOD PLAZA HOTEL OF APPLETON, LLC.  Borrower is of the following organizational type (e.g., corporation, limited liability company): limited liability company, and the jurisdiction in which Borrower is organized is: Wisconsin.  The membership interests in Borrower are owned free and clear of all Liens, warrants, options and rights to purchase.  Borrower has no obligation to any Person to purchase, repurchase or issue any ownership interest in it.  The organizational chart attached hereto as <u>Schedule 4</u> is true, complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower.

### 4.19   <u>Purchase Options</u>.  Neither the Property nor any part thereof is subject to any purchase options, rights of first refusal, rights of first offer or other similar rights in favor of third parties.

### 4.20   <u>Management Agreement</u>.  The Management Agreement is in full force and effect.  There is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto.

### 4.21   <u>Hazardous Substances</u>.  Except as disclosed in that certain Phase I Environmental Study provided to Lender in connection herewith: (i) The Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and

Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any state super-lien and environmental clean-up statutes (including with respect to Toxic Mold), any local law requiring related permits and licenses and all amendments to and regulations in respect of the foregoing laws (collectively, "***Environmental Laws***"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, toxic mold or fungus of a type that may pose a risk to human health or the environment or would negatively impact the value of the Property ("***Toxic Mold***") or any other substances or materials which are included under or regulated by Environmental Laws (collectively, "***Hazardous Substances***"); (iii) to the best of Borrower's knowledge, no Hazardous Substances are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of Borrower's knowledge, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) to the best of Borrower's knowledge, no Toxic Mold is on or about the Property which requires remediation; (vi) no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vii) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which have not been provided to Lender.

      **4.22**   **Name; Principal Place of Business**.  Borrower does not use and will not use any trade name and has not done and will not do business under any name other than its actual name set forth herein; provided, that Borrower may operate the Property under the trade name licensed in the Franchise Agreement.   The principal place of business of Borrower is 720 Eisenhower Drive, Kimberly, Wisconsin 54136, and its primary address for notices is set forth in <u>Section 6.1</u> hereof.  Borrower has no other place of business.

      **4.23**   **Other Debt**.  There is no indebtedness with respect to the Property, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

      **4.24**   **Assignment of Leases and Rents**.  The Assignment of Leases and Rents creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Property.  No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder as a Mortgagee.

      **4.25**   **Insurance**.  Borrower has obtained and has delivered to Lender certificates of all of the Policies, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  No claims have been made under any of the Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

      **4.26**   **FIRPTA**.   Borrower is not a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

4.27 **Fiscal Year**. Each fiscal year of Borrower commences on January 1.

4.28 **Intellectual Property/Websites**. Other than as set forth on Schedule 7, neither Borrower nor any Affiliate (i) has or holds any tradenames, trademarks, servicemarks, logos, copyrights, patents or other intellectual property (collectively, "***Intellectual Property***") with respect to the Property or the use or operations thereof or is (ii) is the registered holder of any website with respect to the Property (other than Tenant websites).

4.29 **Operations Agreements**. Each Operations Agreement is in full force and effect and neither Borrower nor, to Borrower's knowledge, any other party to any Operations Agreement, is in default thereunder, and to the best of Borrower's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder. Except as described herein, the REA has not been modified, amended or supplemented.

4.30 **Illegal Activity**. No portion of the Property has been or will be purchased with proceeds of any illegal activity.

4.31 **Patriot Act; Foreign Corrupt Practices Act**. Neither Borrower nor Guarantor nor any partner in Borrower or Guarantor nor member of such partner nor any other owner of a direct or indirect interest in Borrower or Guarantor (a) is listed on any Government Lists, (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (d) is currently under investigation by any Governmental Authority for alleged criminal activity. No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.32 **Franchise Agreement**. The Franchise Agreement is in full force and effect, there is no default, breach or violation existing thereunder by either party thereto, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation by either party thereunder. Neither the execution and delivery of the Loan Documents or Borrower's performance thereunder will adversely affect Borrower's rights under the Franchise Agreement.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 4.21 above shall survive in perpetuity.

## 5.   **COVENANTS**

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

      **5.1**   **Existence**.  Borrower shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses and all applicable governmental authorizations, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property.

      **5.2**   **Taxes and Other Charges**.  Borrower shall pay all Taxes and Other Charges as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and the Other Charges have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrower need not pay such Taxes nor furnish such receipts for payment of Taxes paid by Lender pursuant to <u>Section 3.3</u> hereof).  Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.  After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and is continuing, (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances, (iii) such proceeding shall suspend the collection of the Taxes or such Other Charges, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (vi) Borrower shall have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon, which shall not be less than 125% of the Taxes and Other Charges being contested, (vii) Borrower shall promptly upon final determination thereof pay the amount of such Taxes or Other Charges, together with all costs, interest and penalties, (viii) such contest shall not affect the ownership, use or occupancy of the Property, and (ix) Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in <u>clauses (i)</u> through <u>(viii)</u> of this <u>Section 5.2</u>. Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage being primed by any related Lien.  Notwithstanding the foregoing, Borrower may contest and seek reduction and reimbursement of Taxes and Other Charges which have been paid in full without the need for Lender consent.

      **5.3**   **Access to Property.**  Borrower shall permit agents, representatives, consultants and employees of Lender to inspect the Property or any part thereof at reasonable hours upon twenty-four (24) hours' advance written notice (email permitted).  If an Event of Default is continuing, Lender or its agents, representatives, consultants and employees as part of any

inspection may take soil, air, water, building material and other samples from the Property, subject to the rights of tenants under Leases.

        5.4        **Repairs; Maintenance and Compliance; Alterations**.

        **5.4.1    Repairs; Maintenance and Compliance**.  Borrower shall at all times maintain, preserve and protect all franchises and trade names, and Borrower shall cause the Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with Section 5.4.2 below and normal replacement of Equipment with Equipment of equivalent value and functionality).  Borrower shall promptly comply with all Legal Requirements and immediately cure properly any violation of a Legal Requirement.  Borrower shall notify Lender in writing within five (5) Business Days after Borrower first receives notice of any such non-compliance, unless Borrower has cured the non-compliance within such five (5) Business Days.  Borrower shall promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated, or as otherwise required to comply with the Franchise Agreement, and shall complete and pay for any Improvements at any time in the process of construction or repair.

        **5.4.2    Alterations**.  Borrower may, without Lender's consent, perform alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not materially adversely affect Borrower's financial condition or the value or Net Operating Income of the Property and (iii) are in the ordinary course of Borrower's business.  Borrower shall not perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, however, that Lender may, in its sole and absolute discretion, withhold consent to any alteration which is likely to result in a decrease of Net Operating Income by twenty percent (20%) or more for a period of sixty (60) days or longer.  If a Cash Management Period or an Event of Default is continuing, Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to 125% of the cost of the Material Alteration as estimated by Lender.  Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of liens from contractors and subcontractors with contracts in excess of $20,000 in the aggregate, and (iii) all material Licenses necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of tenant improvement work) have been issued.

        5.5        **Performance of Other Agreements**.  Borrower shall observe and perform each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property, including the Loan Documents.

**5.6**     **Cooperate in Legal Proceedings**.   Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, and sole cost to participate in, any proceedings before any Governmental Authority which may in any way materially adversely affect the rights of Lender under any Loan Document.

**5.7**     **Further Assurances**.   Borrower shall, at Borrower's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Debt and/or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; (ii) provide all such information as Lender may reasonably require to ensure Borrower's ongoing compliance with Sections 5.26 and 5.31 hereof, including ensuring compliance with all "know your customer" procedures as Lender may from time-to-time institute with respect to loans that are of a similar size and nature as the Loan; and (iii) upon Lender's request therefor given from time to time after the occurrence of any Default or Event of Default pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

**5.8**     **Environmental Matters**.

**5.8.1**     **Hazardous Substances**.   So long as Borrower owns or is in possession of the Property, Borrower shall (i) keep the Property free from Hazardous Substances the release or presence of which would violate Environmental Laws and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance in violation of any Environmental Laws is on or near the Property, (B) the Property is in violation of any Environmental Laws or (C) any condition on or near the Property shall pose a threat to the health, safety or welfare of humans and (iii) remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, as required by law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("**_Lender's Consultant_**")), promptly after Borrower becomes aware of same, at Borrower's sole expense.  Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal or cure.

**5.8.2**     **Environmental Monitoring**.

(a)     Borrower shall give prompt written notice to Lender of (i) any legal proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened by any third party (including any Governmental Authority) against Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law.  Upon

becoming aware of the presence of mold or fungus at the Property, Borrower shall (i) undertake an investigation to identify the source(s) of such mold or fungus and shall develop and implement an appropriate remediation plan to eliminate the presence of any Toxic Mold, (ii) perform or cause to be performed all acts reasonably necessary for the remediation of any Toxic Mold (including taking any action necessary to clean and disinfect any portions of the Property affected by Toxic Mold, including providing any necessary moisture control systems at the Property), and (iii) provide evidence reasonably satisfactory to Lender of the foregoing.  Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

(b)　　If an Event of Default shall exist or Lender has a reasonable basis to suspect that an environmental condition exists in violation of Environmental Laws, upon Lender's written request, Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property, and, after the occurrence of an Event of Default, or if Lender determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrower. Such inspections and audit may include soil borings and ground water monitoring.  If Borrower fails to provide any such inspection or audit within forty-five (45) days after such request, Lender may order same, and Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)　　If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense upon request of Lender, and with respect to any Toxic Mold, Borrower shall take all action necessary to clean and disinfect any portions of the Improvements affected by Toxic Mold in or about the Improvements, including providing any necessary moisture control systems at the Property.  If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("***Remedial Work***"), Borrower shall commence all such Remedial Work within sixty (60) days after written demand by Lender and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law.  All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender.  All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work.  If Borrower does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense. Notwithstanding the foregoing, Borrower shall not be required to commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in

Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work.  Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in such contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than 125% of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such  contest.

(d)     Borrower shall not install or permit to be installed on the Property any underground storage tank.

**5.8.3**   <u>O & M Program</u>.  In the event any environmental report delivered to Lender in connection with the Loan recommends the development of or continued compliance with an operation and maintenance program for the Property (including with respect to the presence of asbestos and/or lead-based paint) ("***O & M Program***"), Borrower shall develop (or continue to comply with, as the case may be) such O & M Program and shall, during the term of the Loan, including any extension or renewal thereof, comply in all material respects with the terms and conditions of the O & M Program.

**5.9**     <u>Title to the Property</u>.  Borrower will warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons.

**5.10**     <u>Leases</u>.

**5.10.1** <u>Generally</u>.   Upon request, Borrower shall furnish Lender with executed copies of all Leases then in effect.  All renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to existing local market rates and shall be arm's length transactions with bona fide, independent third-party tenants.

**5.10.2** <u>Leases</u>.

(a)     Borrower shall not enter into a proposed Lease or a proposed renewal, extension or modification of an existing Lease without the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be  unreasonably

withheld or delayed.  Prior to seeking Lender's consent to any Lease, Borrower shall deliver to Lender a copy of such proposed lease (a "***Proposed Lease***").  Lender shall approve or disapprove each Proposed Lease or proposed renewal, extension or modification of an existing Lease for which Lender's approval is required under this Agreement within fifteen (15) Business Days of the submission by Borrower to Lender of a written request for such approval, accompanied by a final copy of the Proposed Lease or proposed renewal, extension or modification of an existing Lease.  If requested by Borrower, Lender will grant conditional approvals of Proposed Leases or proposed renewals, extensions or modifications of existing Leases at any stage of the leasing process, from initial "term sheet" through negotiated lease drafts, provided that Lender shall retain the right to disapprove any such Proposed Lease or proposed renewal, extension or modification of an existing Lease, if subsequent to any preliminary approval material changes are made to the terms previously approved by Lender, or additional material terms are added that had not previously been considered and approved by Lender in connection with such Proposed Lease or proposed renewal, extension or modification of an existing Lease.

   (b) Provided that no Event of Default is then continuing, to the extent, if any, that Lender's prior written approval is required pursuant to this <u>Section 5.10.2</u>, such request for approval shall be deemed approved if (i) the first correspondence from Borrower to Lender requesting such approval or consent is in an envelope marked "**PRIORITY**" and contains a bold-faced, conspicuous (in a font size that is not less than fourteen (14)) legend at the top of the first page thereof stating that "**<u>FIRST NOTICE</u>:  THIS IS A REQUEST FOR CONSENT UNDER SECTION 5.10.2 OF THE LOAN AGREEMENT, DATED AS OF [_____], AND ENTERED INTO IN CONNECTION WITH THE LOAN MADE TO [_____].  FAILURE TO RESPOND TO THIS REQUEST WITHIN FIFTEEN (15) BUSINESS DAYS MAY RESULT IN THE REQUEST BEING DEEMED GRANTED**", and is accompanied by the information and documents required above, and any other information reasonably requested by Lender in writing prior to the expiration of such fifteen (15) Business Day period in order to adequately review the same has been delivered; and (ii) if Lender fails to respond or to deny such request for approval in writing within the first (5) Business Days of such fifteen (15) Business Day period, a second notice requesting approval is delivered to Lender from Borrower in an envelope marked "**PRIORITY**" containing a bold-faced, conspicuous (in a font size that is not less than fourteen (14)) legend at the top of the first page thereof stating that "**<u>SECOND AND FINAL NOTICE</u>:  THIS IS A REQUEST FOR CONSENT UNDER SECTION 5.10.2 OF THE LOAN AGREEMENT, DATED AS OF [_____], AND ENTERED INTO IN CONNECTION WITH THE LOAN MADE TO [_____].  IF YOU FAIL TO PROVIDE A SUBSTANTIVE RESPONSE (E.G., APPROVAL, DENIAL OR REQUEST FOR CLARIFICATION OR MORE INFORMATION) TO THIS REQUEST FOR APPROVAL IN WRITING WITHIN TEN (10) BUSINESS DAYS, YOUR APPROVAL SHALL BE DEEMED GIVEN**" and Lender fails to provide a substantive response to such request for approval within such final ten (10) Business Day period.

   **5.10.3  <u>Additional Covenants with respect to Leases</u>**.  Borrower (i) shall observe and perform the material obligations imposed upon the lessor under the Leases and shall not do or permit anything to impair the value of the Leases as security for the Debt;  (ii) shall promptly send copies to Lender of all notices of default that Borrower shall send or receive under any Lease; (iii) shall enforce, in accordance with commercially reasonable practices for properties similar to the Property, the terms, covenants and conditions in the Leases to be observed or

performed by the lessees, short of termination thereof; (iv) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (v) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (vi) shall not modify any Lease in a manner inconsistent with the Loan Documents; (vii) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under Leases; (viii) shall not consent to any assignment of or subletting under any Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to a subletting, may not, so long as no Event of Default is continuing, be unreasonably withheld or delayed; and (ix) shall not cancel or terminate any Lease or accept a surrender thereof (except in the exercise of Borrower's commercially reasonable judgment in connection with a tenant default under a Lease) without the prior consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed.

　　　　**5.11**　　**Estoppel Statement**.  Borrower shall deliver to Lender, upon request, and at no out of pocket expense to Borrower, estoppel certificates from each party under any Operations Agreement, in form and substance reasonably satisfactory to Lender; provided, that Borrower shall not be required to deliver such certificates more than two (2) times during the Term and not more frequently than once per calendar year (or twice during any calendar year in which a Securitization occurs).

　　　　**5.12**　　**Property Management**.

　　　　　　**5.12.1**　**Management Agreement**.  Borrower shall (i) cause the Property to be managed pursuant to the Management Agreement; (ii) promptly perform and observe all of the covenants required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its rights thereunder; (iii) promptly notify Lender of any default under the Management Agreement of which it is aware; (iv) upon Lender's request, promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other notice, report and estimate received by Borrower under the Management Agreement; and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.  Without Lender's prior written consent, which will not be unreasonably withheld Borrower shall not (a) surrender, terminate or cancel the Management Agreement or otherwise replace Manager or enter into any other management agreement (except pursuant to Section 5.12.2 below); (b) reduce or consent to the reduction of the term of the Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Management Agreement; (d) otherwise modify, change, supplement, alter or amend in any material respect, or waive or release any of its rights and remedies under, the Management Agreement; or (e) suffer or permit the occurrence and

continuance of a default beyond any applicable cure period under the Management Agreement (or any successor management agreement) if such default permits Manager to terminate the Management Agreement (or such successor management agreement.

**5.12.2  Termination of Manager**.  If (i)  an Event of Default shall be continuing, (ii) Manager is in default under the Management Agreement, (iii) Manager shall become a debtor in any Bankruptcy Proceeding or (iv) upon the gross negligence, malfeasance or willful misconduct of Manager, Borrower shall, at the request of Lender, terminate the Management Agreement and replace Manager with a replacement manager acceptable to Lender in Lender's reasonable discretion and, if a Securitization has occurred, the applicable Rating Agencies, on terms and conditions satisfactory to Lender.  Borrower's failure to appoint an acceptable manager within thirty (30) days after Lender's request of Borrower to terminate the Management Agreement shall constitute an immediate Event of Default.  Borrower may from time to time appoint a successor manager to manage the Property, provided that such successor manager and Management Agreement shall be approved in writing by Lender in Lender's reasonable discretion.  If at any time Lender consents to the appointment of a new manager, such new manager and Borrower shall, as a condition of Lender's consent, execute a consent and subordination of management agreement substantially in the form of the Consent and Subordination of Manager of even date herewith executed and delivered by Manager to Lender.

**5.13  Special Purpose Entity**.  Borrower shall at all times be a Special Purpose Entity.  Borrower shall not directly or indirectly make any change, amendment or modification to its organizational documents, or otherwise take any action which could result in Borrower not being a Special Purpose Entity.  A "***Special Purpose Entity***" shall have the meaning set forth on Schedule 5 hereto.

**5.14  [Intentionally Omitted**.]

**5.15  Change in Business or Operation of Property**.  Borrower shall not purchase or own any real property other than the Property and shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as a hotel/hospitality property or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property or Force Majeure events).

**5.16  Debt Cancellation**.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration or in the ordinary course of Borrower's business.

**5.17  Affiliate Transactions**.  Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the members of Borrower except in the ordinary course of business and on terms which are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.  Lender acknowledges that the Manager is an Affiliate of Borrower and Guarantor.

5.18 **Zoning**.   Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

5.19 **No Joint Assessment**.   Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

5.20 **Principal Place of Business**.   Borrower shall not change its principal place of business or chief executive office from the address set forth in <u>Section 6.1</u> hereof without first giving Lender thirty (30) days' prior written notice.

5.21 **Change of Name, Identity or Structure**.   Borrower shall not change its name, identity (including its trade name or names) or Borrower's corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender.  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

5.22 **Indebtedness**.   Borrower shall not directly or indirectly create, incur or assume any indebtedness other than (i) the Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property, which in the case of such unsecured trade payables (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of four percent (4%) of the then outstanding amount of the Principal and (C) are paid within one hundred twenty (120) days of the date incurred (collectively, "***Permitted Indebtedness***").

5.23 **License; Intellectual Property; Website**.

5.23.1 **Licenses**.   Borrower shall not Transfer any License required for the operation of the Property.

5.23.2 **Intellectual Property**.   Borrower shall keep and maintain all Intellectual Property owned by Borrower relating to the use or operation of the Property and all Intellectual Property shall be held by and (if applicable) registered in the name of Borrower. Borrower shall not Transfer or let lapse any Intellectual Property owned by Borrower without Lender's prior consent.

**5.23.3 <u>Website</u>**.  Any website with respect to the Property (other than Tenant websites) maintained by or on behalf of Borrower shall be registered in the name of Borrower.  Borrower shall not Transfer any such website without Lender's prior consent.

**5.24    <u>Compliance with Restrictive Covenants</u>**.  Borrower shall at all times comply in all material respects with all Operations Agreements.  Borrower will not enter into, modify, waive in any material respect or release any Easements, Operations Agreements or other Permitted Encumbrances, or suffer, consent to or permit the foregoing, without Lender's prior written consent, which consent shall not be unreasonably withheld.   Notwithstanding the foregoing, Borrower may enter into easements for the benefit of the Property or its operations, such as utility easements and access/parking easements that benefit the Property.

**5.25    <u>ERISA</u>**.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender or any successor or assignee of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code.  Borrower's covenant in this clause (a) is based on the assumption that no portion of  the assets used by Lender in connection with the transactions contemplated under this Agreement and the other Loan Documents constitutes assets of a "benefit plan investor" as defined in Section 3(42) of ERISA and with respect to which Borrower is a party in interest (as defined in Section 3(14) of ERISA) or a disqualified person (as defined in Section 4975 of the Code) unless the conditions are satisfied.

(b)    Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets" within the meaning of 29 C.F.R. 2510.3-101, as modified in application by Section 3(42) of ERISA.

(c)    Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (i) Borrower and Guarantor are not and do not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower and Guarantor are not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) the assets of Borrower and Guarantor do not constitute "plan assets" within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA, and any "benefit plan investor" as defined in Section 3(42) of ERISA.

**5.26    <u>Prohibited Transfers</u>**.

**5.26.1 <u>Generally</u>**.  Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer.  Borrower shall provide Lender with copies of all organizational documents (if any) relating to any Permitted Transfer. Borrower shall pay on demand all of the reasonable costs and expenses incurred by Lender,

including reasonable attorneys' fees and expenses, and, if a Securitization has occurred, including the fees and expenses of Rating Agencies and other outside entities, in connection with considering any proposed Transfer, whether or not the same is permitted or occurs.

### 5.26.2 <u>Transfer and Assumption</u>.

(a)     Notwithstanding the foregoing and subject to the terms and satisfaction of all the conditions precedent set forth in this <u>Section 5.26.2</u>, Borrower shall have the right to Transfer the Property to another party (the "***Transferee Borrower***") and have the Transferee Borrower assume all of Borrower's obligations under the Loan Documents, and have replacement guarantors and indemnitors assume all of the obligations of the indemnitors and guarantors of the Loan Documents (collectively, a "***Transfer and Assumption***"). Borrower may make a written application to Lender for Lender's consent to the Transfer and Assumption, subject to the conditions set forth in paragraphs (b) and (c) of this <u>Section 5.26.2</u>. Together with such written application, Borrower will pay to Lender the reasonable review fee then required by Lender.  Borrower also shall pay on demand all of the reasonable costs and expenses incurred by Lender, including reasonable attorneys' fees and expenses, and, if a Securitization has occurred, including the fees and expenses of Rating Agencies and other outside entities, in connection with considering any proposed Transfer and Assumption, whether or not the same is permitted or occurs.

(b)     Lender's consent, which shall not be unreasonably withheld, to a Transfer and Assumption shall be subject to the following conditions:

(i)     Borrower has provided Lender with not less than thirty (30) days prior written notice, which notice shall contain sufficient detail to enable Lender to determine that the Transferee Borrower complies with the requirements set forth herein;

(ii)     No Default or Event of Default is continuing;

(iii)     Borrower has submitted to Lender true, correct and complete copies of any and all information and documents of any kind requested by Lender concerning the Property, the Transferee Borrower, replacement guarantors and indemnitors and Borrower;

(iv)     Evidence satisfactory to Lender has been provided showing that the Transferee Borrower and such of its Affiliates as shall be designated by Lender comply and will comply with <u>Section 5.13</u> hereof, as those provisions may be modified by Lender taking into account the ownership structure of the Transferee Borrower and its Affiliates;

(v)     If the Loan, by itself or together with other loans, has been the subject of a Secondary Market Transaction, then Lender shall have received a Rating Comfort Letter from the applicable Rating Agencies (if required pursuant to a Pooling and Servicing Agreement from and after the occurrence of a Secondary Market Transaction);

(vi)     Borrower shall have paid all of Lender's reasonable costs and expenses in connection with considering the Transfer and Assumption, and shall have

paid the amount requested by Lender as a deposit against Lender's costs and expenses in connection with the effecting the Transfer and Assumption;

(vii)   Borrower, the Transferee Borrower, and the replacement guarantors and indemnitors shall have indicated in writing in form and substance reasonably satisfactory to Lender their readiness and ability to satisfy the conditions set forth in subsection (c) below;

(viii)   each Acceptable Replacement Guarantor shall execute and deliver to Lender a guaranty of recourse obligations (in substantially the same form as the Guaranty delivered to Lender by Guarantor on the date hereof), pursuant to which, in each case, the Acceptable Replacement Guarantor(s) agree(s) to be liable under each such guaranty of recourse obligations from and after the date of such Transfer and Assumption (whereupon the previous guarantor shall be released from any further liability under the guaranty of recourse obligations for acts that arise from and after the date of such Transfer and Assumption and such Acceptable Replacement Guarantor(s) shall be the "Guarantor" for all purposes set forth in this Agreement);

(ix)   Satisfactory Patriot Act, OFAC and similar searches shall have been received by Lender with respect to (A) each Acceptable Replacement Guarantor, (B) the Transferee Borrower, (C) any Person that Controls Transferee Borrower or owns an equity interest in the Transferee Borrower which equals or exceeds ten percent (10%) and (D) any other Person reasonably required by Lender in order for Lender to fulfill its then-current Patriot Act compliance guidelines;

(x)   (A) The Transferee Borrower shall be Controlled by a Person who is a Qualified Transferee with a minimum ownership interest in the Transferee Borrower reasonably acceptable to Lender, (B) each replacement guarantor and indemnitor is an Acceptable Replacement Guarantor and (C) the identity, experience, financial condition and creditworthiness of the Transferee Borrower and the replacement guarantors and indemnitors shall be satisfactory to Lender; and

(xi)   The proposed property manager and proposed Management Agreement shall be satisfactory to Lender.

(c)   If Lender consents to the Transfer and Assumption, the Transferee Borrower and/or Borrower as the case may be, shall immediately deliver the following to Lender:

(i)   Borrower shall deliver to Lender an assumption fee in the amount of one percent (1%) of the then unpaid Principal;

(ii)   Borrower, the Transferee Borrower and the original and replacement guarantors and indemnitors shall execute and deliver to Lender any and all documents required by Lender, in form and substance required by Lender, in Lender's reasonable discretion;

(iii)    Counsel to the Transferee Borrower and replacement guarantors and indemnitors shall deliver to Lender opinions in form and substance satisfactory to Lender as to such matters as Lender shall require, which may include opinions as to substantially the same matters and were required in connection with the origination of the Loan;

(iv)    Borrower shall cause to be delivered to Lender, an endorsement (relating to the change in the identity of the vestee and execution and delivery of the Transfer and Assumption documents) to the Title Insurance Policy in form and substance acceptable to Lender, in Lender's reasonable discretion (the "*Endorsement*"); and

(v)    Borrower shall deliver to Lender a payment in the amount of all remaining unpaid costs incurred by Lender in connection with the Transfer and Assumption, including but not limited to, Lender's reasonable attorneys' fees and expenses, all recording fees, and all fees payable to the title company for the delivery to Lender of the Endorsement.

(d)    Notwithstanding anything to the contrary set forth in this Agreement, upon the closing of a Transfer and Assumption and execution of a replacement guaranty in accordance with the terms of this Section 5.26.2, Lender shall release Borrower and Guarantor from all obligations under the Loan Documents arising from and after the date of the Transfer and Assumption.

Notwithstanding anything to the contrary contained in this Section 5.26, no Transfer shall be a Permitted Transfer unless such Transfer is made in compliance with the Franchise Agreement.

5.27    **Liens**.  Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any direct or indirect legal or beneficial ownership interest in Borrower, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien.

5.28    **Dissolution**.  Borrower shall not (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Property or (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents.

5.29    **Expenses**.

(a)    Borrower shall reimburse Lender upon receipt of notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender or Servicer in connection with the making of the Loan, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions

by counsel for Borrower; (ii) Borrower's and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Borrower or required of Borrower under the terms of any Loan Document; (iv) filing and recording of any Loan Documents; (v) title insurance, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens in the Property and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; (viii) fees charged by Servicer and (ix) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with any refinancing or restructuring of the Loan in the nature of a "work-out", or any Bankruptcy Proceedings.

(b)  In addition, in connection with any Rating Comfort Letter, Review Waiver or other Rating Agency consent, approval or review requested or required hereunder in connection with  a Defeasance or a Transfer and Assumption, Borrower shall pay all of the reasonable costs and expenses of Lender and Servicer and the costs and expenses of each Rating Agency in connection therewith, and, if applicable, shall pay any fees imposed by any Rating Agency in connection therewith.

(c)  Any costs and expenses due and payable by Borrower hereunder which are not paid by Borrower within ten (10) days after demand may be paid from any amounts in the Deposit Account, with notice thereof to Borrower.  The obligations and liabilities of Borrower under this Section 5.29 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

5.30  **Indemnity**.  Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "***Indemnified Liabilities***") in any manner, relating to or arising out of or by reason of the Loan, including: (i) any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any false information provided by or on behalf

of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Mortgage, the Property or any interest therein, or receipt of any Rents (including due to any Increased Costs); (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder to the extent that it is finally judicially determined that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  Any amounts payable to any Indemnified Party by reason of the application of this paragraph shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid.  The obligations and liabilities of Borrower under this Section 5.30 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

### 5.31   Patriot Act Compliance.

(a)     Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  Lender shall have the right, from time-to-time, to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Lender may, at its option, cause Borrower to comply therewith and any and all reasonable costs and expenses incurred by Lender in connection therewith shall be secured by the Mortgage and the other Loan Documents and shall be immediately due and payable.

(b)     At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, neither Borrower nor Guarantor nor any owner of a ten percent (10%) or greater direct or indirect interest in Borrower or Guarantor (i) shall be listed on any Government Lists, (ii) shall be a person who has been

determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (iii) shall have been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense or (iv) shall be under investigation by any Governmental Authority for alleged criminal activity.

(c)     At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (i) none of the funds or other assets of Borrower or Guarantor or any owner of a ten percent (10%) or greater direct or indirect interest in Borrower or Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder (each, an "***Embargoed Person***"), with the result that the investment in Borrower or Guarantor, any partner in Borrower or Guarantor, any member of any such partner or any other owner of a direct or indirect interest in Borrower or Guarantor would be prohibited by law, or the Loan made by Lender would be in violation of law, (ii) no Embargoed Person shall have any interest of any nature whatsoever in Borrower or Guarantor or any owner of a ten percent (10%) or greater direct or indirect interest in Borrower or Guarantor with the result that the investment in Borrower or Guarantor or any owner of a ten percent (10%) or greater direct or indirect interest in Borrower or Guarantor would be prohibited by law or the Loan would be in violation of law, and (iii) none of the funds of Borrower or Guarantor or any owner of a ten percent (10%) or greater direct or indirect interest in Borrower or Guarantor shall be derived from any unlawful activity with the result that the investment in or Guarantor, any partner in Borrower or Guarantor or any  owner of a ten percent (10%) or greater direct or indirect interest in Borrower or Guarantor would be prohibited by law or the Loan would be in violation of law.

**5.32     Approval of Major Contracts**.  Borrower shall not, without Lender's prior consent: (a) enter into, surrender or terminate any Major Contract to which it is a party or to which Borrower or the Property is subject (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Major Contract to which it is a party or to which Borrower or the Property is subject, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Major Contract to which it is a party or to which Borrower or the Property is subject in any material respect, except on an arm's-length basis and commercially reasonable terms.

**5.33     Franchise Agreement**.

(a)     Borrower shall (i) cause the hotel located on the Property to be operated pursuant to the Franchise Agreement; (ii) promptly perform and observe all of the covenants required to be performed and observed by it under the Franchise Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (iii) promptly notify Lender of any default under the Franchise Agreement of which it is aware; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan,

notice, report and estimate received by it under the Franchise Agreement; and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Franchisor under the Franchise Agreement.

(b)     Borrower shall not without Lender's prior consent: (i) surrender, terminate or cancel the Franchise Agreement; (ii) reduce or consent to the reduction of the term of the Franchise Agreement; (iii) increase or consent to the increase of the amount of any charges under the Franchise Agreement; (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Franchise Agreement; (v) suffer or permit the occurrence of continuance a default beyond any applicable cure period under the Franchise Agreement (or any successor franchise agreement) if such default permits Franchisor to terminate or cancel the Franchise Agreement (or any successor franchise agreement); or (vi) replace Franchisor or enter into any new or replacement Franchise Agreement.

**5.34     Hotel Operation.**  Without in any way limiting the covenants set forth in in the Loan Documents, Borrower shall:  (i) cause the hotel located on the Property to be operated, repaired and maintained as a well-maintained "first-class hotel" which shall mean a hotel providing amenities, services and facilities substantially equivalent or superior to hotels of similar average room rate and targeted market segment from time to time operating in the same or comparable geographic area of the Property, taking into consideration the age and location of the hotel located on the Property and (ii) maintain Inventory in amounts sufficient to meet the hotel industry standard for hotels comparable to the hotel located on the Property and at levels sufficient for the operation of the hotel located on the Property at full occupancy levels.

## 6.     **NOTICES AND REPORTING**

**6.1     Notices**.  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "***Notice***") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, and, with respect to Notices to Lender, for so long as SG is Lender hereunder, if a copy of such Notice is also delivered to SG via electronic mail, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party):

If to Lender:

Societe Generale
245 Park Avenue
New York, New York 10167
Attention: COO – CM Loan Origination
Electronic Mail: US-Glfi-Abp-Cmbs-Notices@sgcib.com

If to Borrower:

> Beechwood Plaza Hotel of Appleton, LLC
> c/o Tari L. Ringelstetter
> 1025 Thoroughbred Lane
> De Pere, Wisconsin 54115
> Electronic Mail: ringels@arnotlaw.com
> Telephone No. (920) 347-1969
> Facsimile No. (920) 347-1970.

A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of overnight delivery, upon the first attempted delivery on a Business Day; or in the case of facsimile, upon the confirmation of such facsimile transmission.

> **6.2**    **Borrower Notices and Deliveries**.  Borrower shall (a) give prompt written notice to Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower which might materially adversely affect Borrower's condition (financial or otherwise) or business or the Property; (ii) any material adverse change in Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (iii) any Default or Event of Default of which Borrower is aware, along with the nature of such Default or Event of Default, the period of time such Default or Event of Default has existed and the action then being taken by Borrower to remedy such Default or Event of Default, and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, Manager, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender.  In addition, after request by Lender (but no more frequently than twice in any year), Borrower shall furnish to Lender (x) within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes, and (y) within thirty (30) days, tenant estoppel certificates addressed to Lender, its successors and assigns from each tenant at the Property in form and substance reasonably satisfactory to Lender; provided, that failure of Borrower to provide any such estoppel shall not be an Event of Default if Borrower has used commercially reasonable efforts to obtain the estoppel from the applicable tenant.

> **6.3**    **Financial Reporting**.

> **6.3.1**    **Bookkeeping**.  Borrower shall keep on a calendar year basis, in accordance with GAAP or other customary accounting system acceptable to Lender consistently applied and consistent with the USALI, and, to the extent required under Section 9.1 hereof, the requirements of Regulation AB, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower, Manager or any Affiliate of Borrower.  Lender shall have the

right from time to time during normal business hours upon reasonable notice and at Lender's sole cost and expense to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall desire. After an Event of Default, Borrower shall pay any costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

6.3.2    **Annual Reports**. Borrower shall furnish to Lender annually, within 120 days after each calendar year, a complete copy of Borrower's annual financial statements, each in accordance with GAAP or other customary accounting system acceptable to Lender consistently applied and consistent with the USALI, and, to the extent required under Section 9.1 hereof, the requirements of Regulation AB, and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may reasonably request. Such financial statements (x) shall be in form and substance satisfactory to Lender, (y) shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual Net Operating Income as well as a list of Leases of the Property (if applicable) and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate in all material respects and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP or other customary accounting system acceptable to Lender, consistently applied and consistent with the USALI, and, to the extent required under Section 9.1 hereof, the requirements of Regulation AB,  (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it, and (3) that as of the date of such Officer's Certificate, no litigation exists involving Borrower or the Property in which the amount involved is $250,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto.

6.3.3    **Monthly/Quarterly Reports**. Borrower shall furnish the following items to Lender within twenty (20) days after (x) prior to a Securitization, the end of each calendar month or (y) from and after a Securitization, the end of each calendar quarter: (i) monthly and year-to-date operating statements, noting Net Operating Income and other information necessary and sufficient under GAAP or other customary accounting system acceptable to Lender, consistently applied, to fairly represent the financial position and results of operation of the Property during such calendar month or quarter (as applicable), all in form satisfactory to Lender; (ii) a balance sheet for such calendar month or quarter (as applicable); (iii) a comparison of the budgeted departmental income and expenses and the actual departmental income and expenses for each month and year-to-date for the Property, and upon request from Lender, a detailed explanation of any variances of twenty-five percent (25%) or more (but at least a $10,000 variance) between budgeted and actual amounts for such period and year-to-date; (iv) a statement of the actual Capital Expenses made by Borrower during each calendar month or quarter (as applicable) as of the last day of such calendar month or quarter (as applicable); (v) a statement that Borrower has not incurred any indebtedness other than Permitted Indebtedness; (vi) intentionally omitted; (vii) all franchise inspection reports received by Borrower in such quarter (or month); (viii) intentionally omitted; (ix) a statement setting forth the occupancy rates (including the average daily rate) of the Property; and (x) the Smith Travel Research, Inc.'s STAR report of the Property for such quarter (or month). Each such statement prior to Securitization shall be accompanied by an Officer's

Certificate certifying, to the best of the signer's knowledge, (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP or other customary accounting system acceptable to Lender, consistently applied (subject to normal year-end adjustments), and, to the extent required under Section 9.1 hereof, the requirements of Regulation AB, (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it, and (3) that as of the date of such Officer's Certificate, no litigation exists involving Borrower or the Property in which the amount involved is $250,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto; following Securitization, an Officer's Certificate accompanying such aforementioned statement shall be required not more than once per year.  Such financial statements shall contain such other information as shall be reasonably requested by Lender for purposes of calculations to be made by Lender pursuant to the terms hereof.

   **6.3.4** **Other Reports**.  Borrower shall furnish to Lender, within twenty (20) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower or Manager as may be reasonably requested by Lender or any applicable Rating Agency.  Borrower shall submit to Lender the financial data and financial statements required, and within the time periods required, under clauses (f) and (g) of Section 9.1, if and when available.

   **6.3.5** **Annual Budget**

    Borrower shall prepare and submit (or shall cause Manager to prepare and submit) to Lender, by November 30th of each year during the Term, a budget for the Property for the succeeding calendar year and, promptly after preparation thereof, any revisions to such Annual Budget (such budget and any revisions being the "***Annual Budget***").  Upon the occurrence and during the continuance of a Cash Management Period, such Annual Budget shall be subject to the approval of Lender, which approval shall not (provided no Event of Default is continuing) be unreasonably withheld or delayed.  Each Annual Budget submitted by Borrower while no Cash Management Period is continuing or approved by Lender during the continuance of a Cash Management Period is referred to herein as the "***Approved Annual Budget***".  The Annual Budget shall consist of (i) an operating expense budget showing, on a month-by-month basis, in reasonable detail, each line item of Borrower's anticipated operating income and operating expenses (on a cash and accrual basis), including amounts required to establish, maintain and/or increase any monthly payments required hereunder (and once such Annual Budget has, so long as no Cash Management Period is continuing, been submitted to Lender or, during a Cash Management Period been by Lender, such operating expense budget shall be referred to herein as the "***Approved Operating Budget***"), and (ii) a Capital Expense budget showing, on a month-by-month basis, in reasonable detail, each line item of anticipated Capital Expenses (and once such Annual Budget has, so long as no Cash Management Period is continuing, been submitted to Lender or, during a Cash Management Period been approved by Lender, such Capital Expense budget shall be referred to herein as the "***Approved Capital Budget***").  Until such time that any Annual Budget has been approved by Lender, the prior Approved Annual Budget shall apply for all purposes hereunder (with such adjustments as reasonably determined by Lender (including increases for any non-discretionary expenses)).

### 6.3.6   **Additional Operating Expenses**.

(a)     During a Cash Management Period, in the event that Borrower incurs or will incur any operating expense, including Emergency Expenditures, that is not in the Approved Annual Budget but is otherwise an Approved Operating Expense (each an "***Additional Operating Expense***"), then Borrower shall promptly (but in no event shall Borrower be required to do so more frequently than monthly) deliver to Lender a reasonably detailed explanation of such Additional Operating Expense(s) or, with respect to any such item that is subject to Lender's approval, such proposed Additional Operating Expense.  Any Additional Operating Expense submitted to Lender (and, if required, approved by Lender) in accordance with this Agreement is referred to herein as an "***Approved Additional Operating Expense***".

(b)     Any funds distributed to Borrower for the payment of Approved Additional Operating Expenses (including any distribution to Borrower pursuant to Section 3.10(a)(vi)) shall be used by Borrower only to pay for Approved Additional Operating Expenses or reimburse Borrower for Approved Additional Operating Expenses, as applicable.

### 6.3.7   Breach.  If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "***Required Records***") required by this Article 6 within thirty (30) days after the date upon which such Required Record is due, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $1,000 for each Required Record that is not delivered; provided Lender has given Borrower at least thirty (30) days prior notice of such failure.  In addition, thirty (30) days after Borrower's failure to deliver any Required Records, Lender shall have the option, upon fifteen (15) days' notice to Borrower to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.

### 6.3.8   Hotel Accounting.  All monthly and other operating statements to be delivered by Borrower hereunder shall be (and all accompanying Officer's Certificates shall state that they have been) prepared based upon USALI.

## 7.   **INSURANCE; CASUALTY; AND CONDEMNATION**

### 7.1   **Insurance.**

#### 7.1.1   **Coverage**.  Borrower, at its sole cost, for the mutual benefit of Borrower and Lender, shall obtain and maintain during the Term the following policies of insurance:

(a)     Property insurance insuring against loss or damage customarily included under so called "all risk" or "special form" policies including but not limited to: fire, lightning, windstorm, vandalism, malicious mischief,  and subject to subsection (j) below, coverage for damage or destruction caused by the acts of "Terrorists" (or such policies shall have no exclusion from coverage with respect thereto) and such other insurable hazards as, under good insurance practices for this loan type, from time to time are insured against for other property and buildings similar to the premises in nature, use, location, height, and type of construction.  Each

such insurance policy shall (i) be in an amount equal to 100% full replacement cost of the Improvements without deduction for depreciation, (ii) have deductibles no greater than 25,000 per occurrence, (iii) be paid annually in advance and (iv) be issued on a replacement cost basis containing either no coinsurance or an agreed amount endorsement waiving any coinsurance provision, and shall cover, without limitation, all tenant improvements and betterments that Borrower is required to insure.  Lender shall be named Mortgagee and Loss Payee under a New York Standard Mortgagee Clause, or equivalent.

(b)     Flood insurance if any part of the Property is located in an area now or hereafter designated by the Federal Emergency Management Agency as Flood Zone "A" or "V," or such other Special Hazard Flood Area if Lender so requires in its sole discretion. Such policy shall (i) be in an amount equal to (A) 100% of the full replacement cost of the Improvements on the Property (without any deduction for depreciation) or (B) such other amount as agreed to by Lender, and (ii) have a maximum permissible deductible of $5,000 per building.

(c)     Liability insurance with no exclusion for terrorism including (i) commercial general liability insurance; (ii) liquor liability insurance, if the Property is a hotel and liquor is sold anywhere on the premises; and (iii) excess liability/umbrella insurance. Such liability insurance shall provide minimum limits of $1,000,000 per occurrence and $2,000,000 in the aggregate for each policy year (on a "per location" basis with no annual policy aggregate cap or sublimit), with a maximum deductible or self-insured retention of $25,000; with at least $15,000,000 excess liability/umbrella insurance for any and all covered claims.  The policies described in this subsection shall include coverage for "Personal and Advertising Injury," "Contractual Liability" (covering, to the maximum extent permitted by law, Borrower's obligation to indemnify Lender as required under this Agreement and the other Loan Documents), and "Products and Completed Operations." All liability policies, except excess liability/umbrella, shall name Lender as Additional Insured.

(d)     Loss of rents insurance, if the Property is not a hotel, (i) with Lender being named as "Lender Loss Payee", (ii) in an amount equal to 100% of the projected Rents for a period of at least 12 months for the initial period of restoration.  Business income insurance is required (i) with Lender being as "Lender Loss Payee," (ii) in an amount equal to the projected lost net profit, continuing expenses and necessary payroll for a period of at least 18 months, for the initial period of restoration,  plus a six-month Extended Period of Indemnity which provides that after the physical loss to the Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or until the limit for such coverage as required above is exhausted, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period.  The amount of such loss of rents or business income insurance shall be increased  each year at renewal during the Term, as and when the estimated or actual Rents or business income exposure increases.

(e)     Equipment breakdown insurance, formerly known as boiler and machinery insurance, covering all pressure vessels, underground piping, mechanical and electrical equipment against physical damage, as well as any resulting physical damage to the building improvements, including all tenant improvements and betterments and loss or rents or business income that Borrower is required to insure pursuant to the lease, on a replacement cost basis and in an amount acceptable to Lender.

(f)     Worker's compensation coverage for any employees of Borrower, as required by any Legal Requirement.

(g)     During any period of restoration, renovation or construction, and if such work is excluded under the "all risk" or "special form" and/or general liability insurance policies, builder's risk or course of construction insurance on a so called completed value basis in an amount equal to not less than the 100% of the full replacement cost of the Property, and construction operations liability and Owner's and Contractor's Protective Liability on terms consistent with the coverage requirements set forth in Section 7.1.1(a) and (c) above, in form and substance acceptable to Lender.

(h)     Ordinance and law coverage, if at any time during the loan term the Property is deemed to be a legal non-conforming use or structure, covering the value of the undamaged portion, demolition and debris removal and the increased cost of construction in amounts satisfactory to Lender.

(i)     Such other insurance (including but not limited to pollution legal liability insurance, mine subsidence insurance, and windstorm insurance if windstorm insurance is excluded under the "all risk" or "special form" policy) as may from time to time be reasonably required by Lender in order to protect its interests.

(j)     Notwithstanding anything in subsections (a) and (d) above to the contrary, Borrower shall be required to obtain and maintain coverage as part of its property insurance Policy against loss or damage by terrorist acts in an amount equal to 100% of the "Full Replacement Cost" of the Property plus loss of rents or business income; provided that such coverage is available.  There shall also be no exclusion for acts of terrorism under the general liability and excess liability/umbrella Policies.   In the event that such coverage with respect to terrorist acts is not included as part of the policies required by subsections (a) and (d) above and/or the general liability and excess liability/umbrella Policies required by subsection (c) above, Borrower shall, nevertheless be required to obtain coverage for terrorism (as stand-alone coverage) in an amount equal to 100% of the "Full Replacement Cost" of the Property under subsection (a) above, the loss of rents and/or business interruption coverage under subsection (d) and general liability and excess liability/umbrella coverage under subsection (c) above; provided that such coverage is available.  Borrower shall obtain the coverage required under this subsection (j) from a carrier which otherwise satisfies the rating criteria specified in Section 7.1.2 below (a "**Qualified Carrier**") or in the event that such coverage is not available from a Qualified Carrier, Borrower shall obtain such coverage from the highest rated insurance company providing such coverage.

**7.1.2     Policies**.  All policies of insurance (the "**Policies**") required pursuant to Section 7.1.1 above shall (i) be issued by companies approved by Lender and authorized to do business in the State, with a claims paying ability rating of "A-" or better by S&P or "A3" or better by Moody's (and the equivalent by any other Rating Agency), and a rating of A-X or better in the current Best's Insurance Reports; (ii) name Lender and its successors and/or assigns as their interest may appear as the mortgagee (in the case of property insurance), loss payee (in the case of business interruption/loss of rents coverage) and an additional insured (in the case of liability insurance); (iii) contain (in the case of property insurance) a Non-Contributory Standard New York Mortgagee Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming Lender

as the person to which all payments made by such insurance company shall be paid; (iv) contain a waiver of subrogation in favor of Lender; (v) intentionally omitted; (vi) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under the Policies, (B) that Lender shall receive at least thirty (30) days' prior written notice of cancellation of the property Policies, and Borrower or its management company as first named insured shall receive at least thirty (30) days' prior written notice cancellation of liability Policies, and (C) providing that Lender is permitted to make payments to effect the continuation of such policies upon notice of cancellation due to non-payment of premiums; (vii) in the event any insurance policy (except for workers' compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (viii) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds.   Borrower shall pay the premiums for such Policies (the "***Insurance Premiums***") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to <u>Section 3.3</u> hereof) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender.   If Borrower does not furnish such evidence and receipts prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate.   Borrower shall deliver to Lender a certified copy of each Policy within ten (10) days after request by Lender, provided the Policy is available.   Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

    **7.2**    <u>**Casualty**</u>.

        **7.2.1**    <u>**Notice; Restoration**</u>.   If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "***Casualty***"), and the loss exceeds $100,000, Borrower shall give prompt notice thereof to Lender.   Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

        **7.2.2**    <u>**Settlement of Proceeds**</u>.   If a Casualty covered by any of the Policies (an "***Insured Casualty***") occurs where the loss does not exceed $250,000, provided no Default or Event of Default has occurred and is continuing, Borrower may settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a competent and timely manner, and Borrower is hereby authorized to collect and receipt for the insurance proceeds (the "***Proceeds***").   In the event of an Insured Casualty where the loss equals or exceeds $250,000 (a "***Significant Casualty***"), Lender may, in its reasonable discretion, settle and adjust

any claim without the consent of Borrower and agree with the insurer(s) on the amount to be paid on the loss, and the Proceeds shall be due and payable solely to Lender and held by Lender in the Casualty/Condemnation Subaccount and disbursed in accordance herewith.  If Borrower or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, Borrower shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse such check payable to the order of Lender.  The reasonable expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall be reimbursed by Borrower to Lender upon demand.  Notwithstanding anything to the contrary contained herein, if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrower, such payment shall not be treated as business or rental interruption insurance proceeds unless Borrower has demonstrated to Lender's satisfaction that the remaining net Proceeds that will be received from the property insurance carriers are sufficient to pay 100% of the cost of fully restoring the Improvements or, if such net Proceeds are to be applied to repay the Debt in accordance with the terms hereof, that such remaining net Proceeds will be sufficient to pay the Debt in full with no prepayment penalty.

### 7.3    **Condemnation**.

**7.3.1    <u>Notice; Restoration</u>**.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "***Condemnation***") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation.  Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation.

**7.3.2    <u>Collection of Award</u>**.  Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment in respect of a Condemnation (an "***Award***") and to make any compromise, adjustment or settlement in connection with such Condemnation.  Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of the Award sufficient to pay the Debt.  Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.  Lender shall hold such Award in the Casualty/Condemnation Subaccount and disburse such Award in accordance with the terms hereof.

### 7.4 **Application of Proceeds or Award**.

**7.4.1 Application to Restoration**.    If an Insured Casualty or Condemnation occurs where (a) (i) in the event of a Casualty the Casualty resulted in an actual or constructive loss of less than twenty-five percent (25%) of the replacement costs of the Property, or (ii) in the event of a Condemnation, the Condemnation resulted in an actual or constructive loss of less than fifteen percent (15%) of the fair market value of the Property, less than fifteen percent (15%) of the land constituting the Property is taken, such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is the subject of such Condemnation, (b) in the reasonable judgment of Lender, the Property can be restored within the earliest to occur of (1) eighteen (18) months from the date of the Insured Casualty or Condemnation, (2) six (6) months before the Stated Maturity Date and (3) the expiration of the rental loss or business interruption insurance with respect thereto, to the Property's pre-existing condition and utility as existed immediately prior to such Insured Casualty or Condemnation and to an economic unit not less valuable and not less useful than the same was immediately prior to the Insured Casualty or Condemnation, and after such restoration will secure the Debt to the same extent as immediately prior to such Insured Casualty, (c) the Debt Service Coverage Ratio for the Property, after giving effect to the Restoration, shall be equal to or greater than 1.30:1.00, (d) in the reasonable judgment of Lender, the Restoration can and will be completed in accordance with any requirements under the Franchise Agreement; and (e) no Default or Event of Default shall have occurred and be then continuing, then the Proceeds or the Award, as the case may be (after reimbursement of any expenses incurred by Lender), shall be applied to reimburse Borrower for the cost of restoring, repairing, replacing or rebuilding the Property (the "**Restoration**"), in the manner set forth herein.  Borrower shall commence and diligently prosecute such Restoration. Notwithstanding the foregoing, in no event shall Lender be obligated to apply the Proceeds or Award to reimburse Borrower for the cost of Restoration unless, in addition to satisfaction of the foregoing conditions, both (x) Borrower shall pay (and if required by Lender, Borrower shall deposit with Lender in advance) all costs of such Restoration in excess of the net amount of the Proceeds or the Award made available pursuant to the terms hereof; and (y) Lender shall have received evidence reasonably satisfactory to it that during the period of the Restoration, the Rents will be at least equal to the sum of the operating expenses and Debt Service and other reserve payments required hereunder, as reasonably determined by Lender.

### 7.4.2 **Application to Debt**.

(a)    Except as provided in Section 7.4.1 above, any Proceeds and/or Award may, at the option of Lender in its discretion, be applied to the payment of (i) accrued but unpaid interest on the Note, (ii) the unpaid Principal and (iii) other charges due under the Note and/or any of the other Loan Documents, or applied to reimburse Borrower for the cost of any Restoration, in the manner set forth in Section 7.4.3 below.  Any prepayment of the Loan made pursuant to this Section 7.4.2 shall be without any Yield Maintenance Premium.

(b)    Notwithstanding anything to the contrary set forth in this Agreement, including the provisions of this Section 7.4, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the Lien of the Mortgage following a Casualty or Condemnation (but taking into account any proposed Restoration of the remaining Property), the ratio of the unpaid principal balance of the Loan to the value of the remaining

Property is greater than 125% (such value to be determined, in Lender's reasonable discretion or by an MAI appraisal in form acceptable to Lender and obtained at Borrower's expense; and which shall exclude the value of personal property or going concern value, if any), the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts:  (i) the net Award (after payment of Lender's costs and expenses and any other fees and expenses that have been approved by Lender), (ii) 100% of the fair market value of the released property at the time of the release, or (iii) an amount such that the loan-to-value ratio of the Loan (as so determined by as provided above) does not exceed 100% after the release, unless Lender receives an opinion of counsel that if such amount is not paid, the applicable Securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Mortgage.  If and to the extent the preceding sentence applies, only such amount of the net Award, if any, in excess of the amount required to pay down the principal balance of the Loan may be released for purposes of Restoration or released to Borrower as otherwise expressly provided in this <u>Section 7.4</u>.

        **7.4.3**   **Procedure for Application to Restoration**.  If Borrower is entitled to reimbursement out of the Proceeds or an Award held by Lender, such Proceeds or Award shall be disbursed from time to time from the Casualty/Condemnation Subaccount upon Lender being furnished with (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) a fixed price or guaranteed maximum cost construction contract for Restoration satisfactory to Lender, (iii) prior to the commencement of Restoration, all immediately available funds in addition to the Proceeds or Award that in Lender's judgment are required to complete the proposed Restoration, (iv) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey, permits, approvals, licenses and such other documents and items as Lender may reasonably require and approve in Lender's discretion, and (v) all plans and specifications for such Restoration, such plans and specifications to be approved by Lender prior to commencement of any work.  Lender may, at Borrower's expense, retain a consultant to review and approve all requests for disbursements, which approval shall also be a condition precedent to any disbursement.  No payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than the Proceeds or Award shall be disbursed prior to disbursement of such Proceeds or Award; and at all times, the undisbursed balance of such Proceeds or Award remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien.  Provided no Default or Event of Default then exists, any surplus that remains out of the Proceeds held by Lender after payment of such costs of Restoration shall be paid to Borrower.  Any surplus that remains out of the Award received by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt (without any Yield Maintenance Premium) or returned to Borrower.

# 8.    <u>DEFAULTS</u>

        **8.1**   **Events of Default**.  An "*Event of Default*" shall exist with respect to the Loan if any of the following shall occur:

(a)      (i) any portion of the Debt is not paid when due or (ii) Borrower shall fail to pay when due any payment required under Sections 3.3, 3.4, 3.5, 3.6 or 3.8 hereof;

(b)      any of the Taxes are not paid when due (unless Lender or Servicer was responsible for paying such Taxes pursuant to Section 3.3 hereof and Lender failed to pay), subject to Borrower's right to contest Taxes in accordance with Section 5.2 hereof;

(c)      the Policies are not kept in full force and effect (unless Lender or Servicer was responsible for paying the related Insurance Premiums pursuant to Section 3.3 hereof and Lender or Servicer failed to pay), or are not delivered to Lender upon request;

(d)      a Transfer other than a Permitted Transfer occurs;

(e)      any certification, representation or warranty made by Borrower or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower or Guarantor in connection with any Loan Document, shall be false or misleading in any material respect as of the date the certification, representation or warranty was made;

(f)      Borrower or Guarantor file a voluntary petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law ,or any similar federal or state law;

(g)      a receiver, liquidator or trustee shall be appointed for Borrower or Guarantor; or Borrower or Guarantor shall be adjudicated a bankrupt or insolvent; or any Bankruptcy Proceeding, or any other petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal, state or foreign law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of Borrower or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within one hundred twenty (120) days;

(h)      Borrower breaches any covenant contained in Sections 5.12.1(a) - (e), 5.13, 5.15, 5.22, 5.25 or 5.28 hereof;

(i)      except as expressly permitted hereunder, the actual or threatened alteration, improvement, demolition or removal of all or any portion of the Improvements without the prior written consent of Lender;

(j)      an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs; or any other event shall occur or condition shall exist, if the effect of such event or condition is to accelerate or to permit Lender to accelerate the maturity of any portion of the Debt;

(k)      any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of

the Debt, ceases to be in full force and effect; or Borrower or Guarantor contests in any manner the validity or enforceability of any Loan Document; or Borrower or Guarantor denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document;

(l)      except to the extent expressly permitted by the terms of this Agreement or any other Loan Document, the Lender shall fail to have an enforceable, perfected, first priority security interest in the Mortgage;

(m)      a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(n)      a default by Borrower under any term, covenant or provision of the Franchise Agreement which continues after the expiration of any applicable notice and cure period and would give Franchisor the right to terminate the Franchise Agreement;

(o)      intentionally omitted; or

(p)      a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this <u>Section 8.1</u>, for ten (10) days after notice to Borrower (and Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default; provided, however, that if such non-monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30)-day period, and Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days.

## 8.2    <u>Remedies</u>.

### 8.2.1    <u>Acceleration</u>.  Upon the occurrence of an Event of Default (other than an Event of Default described in paragraph (f) or (g) of <u>Section 8.1</u> above) and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand (and Borrower hereby expressly waives any such notice or demand), that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium, and any other amounts owing by Borrower), without notice or demand; and upon any Event of Default described in paragraph (f) or (g) of <u>Section 8.1</u> above, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium, and any other amounts owing by Borrower) shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

**8.2.2** **Remedies Cumulative**.   Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.   Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.   Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Mortgage has been foreclosed, the Property has been sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.   To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

**8.2.3** **Severance**.

(a)   During the continuance of an Event of Default and subject to the limitations set forth in Section 9.3 and Section 9.4, Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect.   Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of the sums secured by the Mortgage and not previously recovered.

(b)   During the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents in such denominations and priorities of payment and liens as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.   Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.   Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

**8.2.4    Delay**.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.  Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Mortgage to the extent necessary to foreclose on all or any portion of the Property, the Rents, the Cash Management Accounts or any other collateral.

**8.2.5    Lender's Right to Perform**.  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of ten (10) Business Days after Borrower's receipt of written notice thereof from Lender (or such longer period of notice otherwise provided in the Loan Documents), without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Mortgage and other Loan Documents) and shall bear interest thereafter at the Default Rate.  Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

# 9.    SPECIAL PROVISIONS

**9.1    Sale of Mortgage and Securitization**.  Subject to Section 9.4 hereof and the limitations set forth in Section 9.3 hereof:

(a)    Lender shall have the right (i) to sell, assign, syndicate or otherwise transfer the Loan or any portion thereof as a whole loan, (ii) to sell participation interests in the Loan, or (iii) to securitize the Loan or any portion thereof in a single asset securitization or a pooled loan securitization.  (The transactions referred to in clauses (i), (ii) and (iii) are each hereinafter referred to as a "*Secondary Market Transaction*" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "*Securitization*".  Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "*Securities*").  At Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions.

(b)    If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be required in the marketplace, by prospective investors, the Rating Agencies, applicable Legal Requirements and/or otherwise in the marketplace in connection with up to three (3) Secondary Market Transactions during the Term, including to:

(i)    (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower and Manager,

including the information set forth on Schedule 6 attached hereto, (B) provide updated budgets and rent rolls (including itemized percentage of floor area occupied and percentage of aggregate base rent for each Tenant) relating to the Property, and (C) provide updated appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (collectively, the "**_Updated Information_**"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies;

(ii)      provide opinions of counsel, which may be relied upon by Lender, the trustee in any Securitization, underwriters, NRSROs and their respective counsel, agents and representatives, as to non-consolidation, fraudulent conveyance and true sale or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property, the Loan Documents, and Borrower and its Affiliates, which counsel and opinions shall be satisfactory to Lender and the Rating Agencies; and

(iii)     provide updated, as of the closing date of any Secondary Market Transaction, representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require.

(c)      If, at the time a Disclosure Document is being prepared for a Securitization, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower (including any guarantor or other Person that is directly or indirectly committed by contract or otherwise to make payments on all or a part of the Loan) collectively, or the Property alone or the Property and Related Properties collectively, will be a Significant Obligor, Borrower shall furnish to Lender upon request the following financial information:

(i)      if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Securitization, may equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included in the Securitization, net operating income for the Property and the Related Properties for the most recent Fiscal Year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB), or

(ii)     if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Securitization, may equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included in the Securitization, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X, and statements of income and statements of

cash flows with respect to the Property for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender determines that the Property is the Significant Obligor and the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) was acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

(d)     Further, if requested by Lender, Borrower shall, promptly upon Lender's request, furnish to Lender financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, for any tenant of the Property if, in connection with a Securitization, Lender expects there to be, as of the cut-off date for such Securitization , a concentration with respect to such tenant or group of Affiliated tenants within all of the mortgage loans included or expected to be included in the Securitization such that such tenant or group of Affiliated tenants would constitute a Significant Obligor. Borrower shall furnish to Lender, in connection with the preparation of the Disclosure Documents and on an ongoing basis, financial data and/or financial statements with respect to such tenants meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) filings pursuant to the Exchange Act in connection with or relating to the Securitization (an "***Exchange Act Filing***") are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(e)     If Lender determines that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and Related Properties collectively, are a Significant Obligor, then Borrower shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) Exchange Act Filings are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(f)     Any financial data or financial statements provided pursuant to this Section 9.1 shall be furnished to Lender within the following time periods:

(i)     with respect to information requested in connection with the preparation of Disclosure Documents for a Securitization, within ten (10) Business Days after notice from Lender; and

(ii)     with respect to ongoing information required under Section 9.1(d) and (e) above, (1) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (2) not later than seventy-five (75) days after the end of each Fiscal Year of Borrower.

(g)     If requested by Lender, Borrower shall provide Lender, promptly, and in any event within five (5) Business Days following Lender's request therefor, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall reasonably determine to be required pursuant to Regulation S-K or Regulation S-X, as applicable, Regulation AB, or any amendment, modification or replacement thereto or other Legal Requirements relating to a Securitization or as shall otherwise be reasonably requested by Lender.

(h)     If requested by Lender, whether in connection with a Securitization or at any time thereafter during which the Loan and any Related Loans are included in a Securitization, Borrower shall provide Lender, promptly upon request, a list of tenants of the Property (including all affiliates of such tenants) that in the aggregate (1) occupy 10% or more (but less than 20%) of the total floor area of the improvements or represent 10% or more (but less than 20%) of aggregate base rent, and (2) occupy 20% or more of the total floor area of the improvements or represent 20% or more of aggregate base.

(i)     All financial statements provided by Borrower pursuant to this Section 9.1(c), (d), (e) or (f) shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and other applicable Legal Requirements.  All financial statements relating to a Fiscal Year shall be audited (without any out-of-pocket cost to Borrower for such audit) by independent accountants in accordance with generally accepted auditing standards, Regulation S-X or Regulation S-K, as applicable, Regulation AB, and all other applicable Legal Requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and all other applicable Legal Requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing (or comparable information is required to otherwise be available to holders of the Securities under Regulation AB or applicable Legal Requirements), all of which shall be provided at the same time as the related financial statements are required to be provided.  All other financial statements shall be certified by the chief financial officer of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this paragraph.

## 9.2     Securitization Indemnification.

(a)     Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in preliminary and final disclosure documents in connection with any Secondary Market Transaction, including a Securitization, including an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "***Disclosure Document***") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "***Securities Act***"), or the Securities and Exchange Act of 1934, as amended (the "***Exchange Act***"), and may be made available to investors or prospective investors in the Securities, investment banking firms, NRSROs, accounting firms, law firms and other third-

party advisory and service providers relating to any Secondary Market Transaction, including a Securitization.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by Lender, the Issuer or the Securitization placement agent or underwriter may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

(b)     Borrower hereby agrees to indemnify SG (whether or not it is Lender), any Affiliate of SG that has filed any registration statement relating to the Securitization or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of SG that acts as an underwriter, placement agent or initial purchaser of Securities issued in the Securitization, Lender (and for purposes of this Section 9.2, Lender shall include its officers and directors), each Person who controls SG within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act and each partner, participant, shareholder, member, managing member, agent, representative, counsel, officer, director, trustee and employee of each of the foregoing (collectively, the "*SG Group*"), the issuer of the Securities (the "*Issuer*" and for purposes of this Section 9.2, Issuer shall include its officers, director and each Person who controls the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any placement agent or underwriter with respect to the Securitization, each of their respective officers and directors and each Person who controls the placement agent or underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "*Underwriter Group*") for any losses, claims, damages or liabilities (collectively, the "*Liabilities*") to which Lender, the SG Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon:

(i)     any untrue statement or alleged untrue statement of any material fact contained in the information provided to Lender by Borrower and its agents, counsel and representatives;

(ii)     the omission or alleged omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading; or

(iii)     a breach of the representations and warranties made by Borrower in Section 4.8 of this Agreement.

Borrower also agrees to reimburse Lender, the SG Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the SG Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities.  Borrower's liability under this paragraph will be limited to Liability that arises out of, or is based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property.  This indemnification provision will be in addition to any liability which Borrower may otherwise have.

(c)      In connection with any Exchange Act Filing or other reports containing comparable information that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, Borrower agrees to (i) indemnify Lender, the SG Group, the Issuer and the Underwriter Group for Liabilities to which Lender, the SG Group, the Issuer and/or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property, and (ii) reimburse Lender, the SG Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the SG Group, the Issuer and/or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)      Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this Section 9.2, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.  The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the indemnifying party.  Without the prior written consent of the relevant indemnified party (which consent shall not be unreasonably withheld or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit or proceeding) unless the indemnifying party shall have given the relevant indemnified party reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings.

(e)      In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.2(b) or (c) is for any reason held to be unenforceable as to an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) the Issuer's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances.  Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f)      The liabilities and obligations of both Borrower and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**9.3      Severance of Loan**.  Subject to Section 9.4 below, Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time (whether prior to, in connection with, or after any Secondary Market Transaction), with respect to all or any portion of the Loan, to modify, split and/or sever all or any portion of the Loan as hereinafter provided.  Without limiting the foregoing, Lender may (i) cause the Note and the Mortgage to be split into a first and second mortgage loan, (ii) create one or more senior and subordinate notes (*i.e.*, an A/B or A/B/C structure), (iii) create multiple components of the Note or Notes (and allocate or reallocate the principal balance of the Loan among such components), (iv) otherwise sever the Loan into two (2) or more loans secured by mortgages and by a pledge of partnership or membership interests (directly or indirectly) in Borrower (*i.e.,* a senior loan/mezzanine loan structure), in each such case described in clauses (i) through (iv) above, in whatever proportion and whatever priority Lender determines, and (v) modify the Loan Documents with respect to the newly created Notes or components of the Note or Notes such that the pricing and marketability of the Securities and the size of each class of Securities and the rating assigned to each such class by the Rating Agencies shall provide the most favorable rating levels and achieve the optimum rating levels for the Loan.  Notwithstanding the foregoing, no such amendment described above shall (i) modify or amend any material term of the Loan, or (ii) increase the obligations, or decrease the rights, of Borrower under the Loan Documents; provided, however, in each such instance the outstanding principal balance of all the Notes evidencing the Loan (or components of such Notes) immediately after the effective date of such modification equals the outstanding principal balance of the Loan immediately prior to such modification and the weighted average of the interest rates for all such Notes (or components of such Notes) immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification.  If requested by Lender, Borrower (and Borrower's constituent members, if applicable, and Guarantor) shall execute within two (2) Business Days after such request, such documentation as Lender may reasonably request to evidence and/or effectuate any such modification or severance.  At Lender's election, each note comprising the

Loan may be subject to one or more Securitizations.  Lender shall have the right to modify the Note and/or Notes and any components in accordance with this Section 9.3 and, provided that such modification shall comply with the terms of this Section 9.3, it shall become immediately effective.

        **9.4**      **Costs and Expenses**.  Notwithstanding anything to the contrary, Borrower shall not be required to incur any out-of-pocket costs or expenses in the performance of its obligations under Sections 9.1, 9.2 (excluding the indemnity obligations set forth therein) or Section 9.3 above; further, any financial audits or third party reports prepared by Borrower's consultants at Lender's request shall be prepared at Lender's expense.

## 10.   MISCELLANEOUS

        **10.1**      **Exculpation**.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, or in the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document.  The provisions of this Section 10.1 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases and Rents; (vi) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Mortgage or to exercise its remedies against the Property; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

                (a)      fraud, willful misconduct, misrepresentation by or on behalf of Borrower or Guarantor, in connection with the Loan, including by reason of any claim under the Racketeer Influenced and Corrupt Organizations Act (RICO);

                (b)      the forfeiture by Borrower of the Property, or any portion thereof, because of the conduct or purported conduct of criminal activity by Borrower or Guarantor;

(c)    physical waste of the Property or any portion thereof, or after an Event of Default the removal or disposal of any portion of the Property;

(d)    any Proceeds paid by reason of any Insured Casualty or any Award received in connection with a Condemnation or other sums or payments attributable to the Property not applied in accordance with the provisions of the Loan Documents (except to the extent that Borrower did not have the legal right, because of a bankruptcy, receivership or similar judicial proceeding, to direct disbursement of such sums or payments);

(e)    all Rents of the Property received or collected by or on behalf of Borrower after an Event of Default and not applied to payment of Principal and interest due under the Note, and to the payment of actual and reasonable operating expenses of the Property, as they become due or payable (except to the extent that such application of such funds is prevented by bankruptcy, receivership, or similar judicial proceeding in which Borrower is legally prevented from directing the disbursement of such sums);

(f)    misappropriation or conversion by or on behalf of Borrower (including failure to turn over to Lender on demand following an Event of Default) of any gross revenues (including Rents, advance deposits, any other deposits, rents collected in advance, funds held by Borrower for the benefit of another party and Lease Termination Payments);

(g)    the failure to pay Taxes, provided Borrower shall not be liable to the extent (i) Rents from the Property are insufficient to do so, or (ii) funds to pay such amounts are available in the Tax and Insurance Subaccount and Lender failed to pay same;

(h)    the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Section 4.21 hereof and Section 5.8 hereof, and clauses (viii) through (xi) of Section 5.30 hereof;

(i)    failure to obtain and maintain the fully paid for Policies in accordance with Section 7.1.1 hereof;

(j)    Borrower's indemnification of Lender set forth in Section 9.2 hereof;

(k)    any cost or expense incurred by Lender in connection with the enforcement of its rights and remedies hereunder or any other Loan Document in connection with or arising out of any bankruptcy or insolvency proceeding involving the assets of Borrower;

(l)    if Guarantor, Borrower or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Notes, the Mortgage or any other Loan Document, seeks a defense, judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan except in the case of any legitimate defense, mandatory counterclaim or injunction (whether made or sought by answer or motion) raised by Borrower or any Guarantor in good faith, which is not frivolous, and which is not made

with a purpose or intent to delay or interfere with the exercise by Lender of its rights or remedies under the Loan Documents; and/or

(m)     intentionally omitted;

(n)     if (i) either (A) the Franchise Agreement (or the right to operate the Property thereunder) shall expire, or be cancelled, surrendered or terminated by Borrower or any Affiliate of Borrower, or by reason of any failure of Borrower or any Affiliate of Borrower to perform its obligations thereunder, (B) Borrower amends or modifies the Franchise Agreement without the prior written consent of Lender or (C) any default occurs and is continuing occurs under the Franchise Agreement, or (ii) if, in connection with any Transfer of the Property to Lender (or Lender's designee) in full or partial satisfaction of the Debt, Borrower or any Affiliate of Borrower fails to take any lawful action reasonably necessary to effect the transfer of any liquor license or other Licenses with respect to the Property from the then-current holder thereof to the transferee of the Property or its designee.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each, a "*Springing Recourse Event*"):

(i)     an uncured Event of Default described in <u>Section 8.1(d)</u> hereof shall have occurred;

(ii)     a breach of any of the representations set forth in the "Recycled SPE Certificate" delivered to Lender in connection with the Loan or a breach of the representation set forth in <u>Section 4.1(b)</u> hereof or a breach of the covenants set forth in <u>Section 5.13</u> hereof that results in Borrower being substantively consolidated with any other Person;

(iii)     Borrower files a voluntary petition under the Bankruptcy Code or files a petition for bankruptcy, reorganization or similar proceeding pursuant to any other Federal, state or foreign bankruptcy, insolvency or similar law;

(iv)     the filing of an involuntary petition against Borrower under the Bankruptcy Code or an involuntary petition for bankruptcy, reorganization or similar proceeding pursuant to any other Federal, state or foreign bankruptcy, insolvency or similar law by any other Person in which (x) Borrower or any Affiliate, which, directly or indirectly, Controls Borrower colludes with or otherwise assists such Person, and/or (y) Borrower or any Affiliate, which, directly or indirectly, Controls Borrower solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower by any Person and which is not dismissed within one hundred twenty (120) days of filing;

(v)     Borrower or any Affiliate, which, directly or indirectly, Controls Borrower files an answer consenting to, or otherwise acquiescing in, or joining in, any involuntary petition filed against it by any other Person under the Bankruptcy Code or any other Federal, state or foreign bankruptcy or insolvency law;

(vi)     Borrower or any Affiliate, which, directly or indirectly, Controls Borrower consents to, or acquiesces in, or joins in, an application for the appointment of a custodian, receiver, liquidator, trustee or examiner for Borrower or any portion of the Property; or

(vii)     Borrower makes an assignment for the benefit of creditors.

### 10.2    Brokers and Financial Advisors.

(a)     Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan other than Sonnenblick-Eichner Company ("***Broker***") whose fees shall be paid by Borrower pursuant to a separate agreement.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this <u>Section 10.2</u> shall survive the expiration and termination of this Agreement and the repayment of the Debt.

### 10.3    Retention of Servicer.  Lender reserves the right to retain Servicer to act as its agent hereunder with such powers as are specifically delegated to Servicer by Lender, whether pursuant to the terms of this Agreement, any Pooling and Servicing Agreement, the Deposit Account Agreement or otherwise, together with such other powers as are reasonably incidental thereto.  Borrower shall pay any reasonable fees and expenses of Servicer (i) in connection with a release of the Property (or any portion thereof), (ii) from and after a transfer of the Loan to any special servicer" following an Event of Default, (iii) in connection with an assumption or modification of the Loan, (iv) in connection with the enforcement of the Loan Documents or (v) any reasonable out of pocket costs and expenses incurred in connection with any other action or approval taken by Servicer hereunder on behalf of Lender (which shall not include ongoing regular servicing fees relating to the day-to-day servicing of the Loan, for which Borrower shall not be charged).

### 10.4    Survival; Successors and Assigns.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives,

successors and assigns of such party.  All of Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

### 10.5    **Lender's Discretion; Rating Agency Review Waiver**.

(a)    Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be made in good faith, but in the sole and absolute discretion of Lender and shall be final and conclusive.

(b)    Whenever, pursuant to this Agreement or any other Loan Documents, a Rating Comfort Letter is required from each applicable Rating Agency, in the event that any applicable Rating Agency "declines review", "waives review" or otherwise indicates in writing or otherwise to Lender's or Servicer's satisfaction that no Rating Comfort Letter will or needs to be issued with respect to the matter in question (each, a "***Review Waiver***"), then the Rating Comfort Letter requirement with respect to such Rating Agency shall be deemed to be satisfied with respect to such matter.  It is expressly agreed and understood, however, that receipt of a Review Waiver (i) from any one Rating Agency shall not be binding or apply with respect to any other Rating Agency and (ii) with respect to one matter shall not apply or be deemed to apply to any subsequent matter for which Rating Comfort Letter is required.

(c)    Prior to a Securitization or in the event that there is a Review Waiver, if Lender does not have a separate and independent approval right with respect to the matter in question, then the term Rating Agency Confirmation shall be deemed instead to require the prior written consent of Lender.

### 10.6    **Governing Law**.

(a)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED ACCORDING TO, THE LAW OF THE

STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND THE DEBT.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK  AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT CORPORATION SERVICE COMPANY AT 1180 AVENUE OF THE AMERICAS, SUITE 210, NEW YORK, NEW YORK 10036-8401, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND BORROWER AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF BORROWER MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER (UNLESS LOCAL LAW REQUIRES ANOTHER METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.  NOTWITHSTANDING THE FOREGOING, LENDER SHALL HAVE THE RIGHT TO INSTITUTE ANY LEGAL SUIT, ACTION OR PROCEEDING FOR THE ENFORCEMENT OR FORECLOSURE OF ANY LIEN ON ANY COLLATERAL FOR THE LOAN IN ANY FEDERAL OR STATE COURT IN ANY JURISDICTION(S) THAT LENDER MAY ELECT IN ITS SOLE AND ABSOLUTE DISCRETION, AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

**10.7    Modification, Waiver in Writing**.    No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on, Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

**10.8    Trial by Jury**.  BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**10.9    Headings/Schedules**.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Schedules attached hereto, are hereby incorporated by reference as a part of this Agreement with the same force and effect as if set forth in the body hereof.

**10.10    Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.11    Preferences**.  Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt.  To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state, federal or foreign law, common law

or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

        **10.12**   **Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

        **10.13**   **Remedies of Borrower**.  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment; provided, that the foregoing shall not limit Borrower's remedies against Servicer for any acts of Servicer which are determined by a court of competent jurisdiction by a final and non-appealable judgment to be fraudulent or willful misconduct.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.  To the fullest extent permitted by applicable law, neither Borrower nor Lender shall assert, and Borrower and Lender hereby waive, any claim against the other party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loan, or the use of the proceeds thereof.  Nothing in this Section 10.13 shall limit Borrower's remedies to the extent that both (i) a breach of this Agreement arises from the illegal acts, fraud or willful misconduct of Lender or its agents and (ii) as a result of such breach, Borrower incurs liability or actual damage to third parties.

        **10.14**   **Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

        **10.15**   **Offsets, Counterclaims and Defenses**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset,

counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

      **10.16**  **Publicity**.  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender or any of Lender's Affiliates, a Loan purchaser, Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender. Lender shall have the right to issue any of the foregoing without Borrower's approval.

      **10.17**  **No Usury**.  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

      **10.18**  **Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.   The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation, drafting, execution and delivery of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan, without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or affiliate of Lender of any equity interest any of them may acquire in Borrower.

**10.19** **No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a)      Borrower and Lender intend that the relationships created under the Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, fiduciary, advisory, tenancy-in-common or joint tenancy relationship between Borrower and Lender (or any of Lender's Affiliates) nor to grant Lender (or any of Lender's Affiliates) any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)      The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**10.20** **Yield Maintenance Premium**.  Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents and (b) if payments of Principal are made to Lender prior to the Stated Maturity Date, for any reason whatsoever, whether voluntary, as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs.  For these reasons, and to induce Lender to make the Loan, Borrower agrees that, except as expressly provided in Article 7 hereof, all prepayments, if any, whether voluntary or involuntary, will be accompanied by the Yield Maintenance Premium; provided, however, that the foregoing shall not be deemed to imply that the Loan may be voluntarily prepaid in any manner or under any circumstance other than as expressly set forth in this Agreement.  Such Yield Maintenance Premium shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale.  Borrower further acknowledges that (A) it is a knowledgeable real estate developer and/or investor; (B) it fully understands the effect of the provisions of this Section 10.20, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Yield Maintenance Premium (if required); and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions.  Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Yield Maintenance Premium, and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

**10.21** **Assignments and Participations**.  In addition to any other rights of Lender hereunder, the Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be sold, assigned, participated or otherwise transferred by Lender and any of its successors and assigns to any Person at any time in its sole and absolute discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise without notice to or consent from Borrower or any other Person.  Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender in all respects.  Except as expressly permitted herein, Borrower may

not assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**10.22   Intentionally Deleted.**

**10.23   Waiver of Marshalling of Assets**.  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's members or partners, as applicable, and others with interests in Borrower, and of the Property, and shall not assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection, or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

**10.24   Joint and Several Liability**.  If more than one Person has executed this Agreement as "***Borrower***," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

**10.25   Creation of Security Interest**.  Notwithstanding any other provision set forth in this Agreement, the Note, the Mortgage or any of the other Loan Documents, Lender may at any time create a security interest in all or any portion of its rights under this Agreement, the Note, the Mortgage and any other Loan Document (including the advances owing to it) in favor of any Person, including any central bank or Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

**10.26   Certain Additional Rights of Lender**.  Notwithstanding anything to the contrary which may be contained in this Agreement, Lender shall have:

(i)      the right to routinely consult with Borrower's management regarding the significant business activities and business and financial developments of Borrower, provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances.  Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times;

(ii)     the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any time upon reasonable notice;

(iii)    the right, in accordance with the terms of this Agreement, to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness;

(iv)    the right, without restricting any other right of Lender under this Agreement or the other Loan Documents (including any similar right), to restrict, upon the occurrence of an Event of Default, Borrower's payments of management, consulting, director or similar fees to Affiliates of Borrower from the Rents;

(v)     the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of the Property); and

(vi)    the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict the transfer of interests in Borrower held by its members, and the right to restrict the transfer of interests in such member, except for any transfer that is a Permitted Transfer.

The rights described above may be exercised directly or indirectly by any Person that owns substantially all of the ownership interests in Lender.  The provisions of this Section are intended to satisfy the requirement of management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3-101.

**10.27   Set-Off.   In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.**

**10.28   Counterparts**.   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

BEECHWOOD PLAZA HOTEL OF APPLETON, LLC,
a Wisconsin limited liability company

By: BEECHWOOD DEVELOPMENT, LLC,
a Wisconsin limited liability company
Its Manager

By: _____
Thomas D. Arnot, Managing Member

[signatures continue on following page]

**LENDER:**

**SOCIETE GENERALE**

By: _____
Kevin Kelley, Director

## **SCHEDULE 1**

## **Not Utilized**

## **SCHEDULE 2**

## **Exceptions to Representations and Warranties**

None.

## **SCHEDULE 3**

### **Rent Roll**

[not utilized]

# **SCHEDULE 4**

## **Organization of Borrower**

(see attached)

May 8, 2015

**Exhibit E: Appleton Organizational Chart**



Note: All percentages indicate percent of units outstanding.

## SCHEDULE 5

### Definition of Special Purpose Entity

(I)  A "***Special Purpose Entity***" means a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter:

(i)  was and will be organized solely for the purpose of owning the Property;

(ii)  has not engaged and will not engage in any business unrelated to the ownership of the Property;

(iii)  has not had and will not have any assets other than those related to the Property;

(iv)  has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable);

(v)  intentionally omitted;

(vi)  intentionally omitted;

(vii)  intentionally omitted;

(viii)  intentionally omitted;

(ix)  has not, and without the unanimous consent of all of its partners, directors or members, as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest (A) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or for all or any portion of such entity's properties, (C) make any assignment for the benefit of such entity's creditors or (D) take any action that might cause such entity to become insolvent;

(x)  has remained and intends to remain solvent and has maintained and intends to maintain adequate capital in light of its contemplated business operations; provided, that nothing herein shall require Borrower's Sole Member or Affiliates to contribute capital to Borrower in order to remain solvent;

(xi)  has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii)   has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns unless such entity is a tax disregarded entity not required to file tax returns under applicable law;

(xiii)   has maintained and will maintain its books, records, resolutions and agreements as official records;

(xiv)   has not commingled and will not commingle its funds or assets with those of any other Person;

(xv)   has held and will hold its assets in its own name;

(xvi)   has conducted and will conduct its business in its name; provided that Borrower may operate under the franchise name under the Franchise Agreement;

(xvii)   has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person;

(xviii)   has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets;

(xix)   has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xx)   has maintained and will maintain an arm's-length relationship with its Affiliates;

(xxi)   has not and will not have any indebtedness other than Permitted Indebtedness;

(xxii)   has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except for the Loan;

(xxiii)   has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxiv)   has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks;

(xxv)   except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxvi)   has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxvii) has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxviii) has not made and will not make loans to any Person;

(xxix) has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it;

(xxx)  has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party;

(xxxi)  has and will have no obligation to indemnify its partners, officers, directors or members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xxxii) has and will have an express acknowledgment in its organizational documents that Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents; and

(xxxiii) will consider the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable.

## <u>SCHEDULE 6</u>

### Secondary Market Transaction Information

(A)   Any proposed program for the renovation, improvement or development of the Property, or any part thereof, including the estimated cost thereof and the method of financing to be used.

(B)   The general competitive conditions to which the Property is or may be subject.

(C)   Management of the Property.

(D)   Occupancy rate expressed as a percentage for each of the last five years.

(E)   Principal business, occupations and professions carried on in, or from the Property.

(F)   Each tenant of the Property and principal nature of business of such tenant, and the principal provisions of the Leases with those tenants including, but not limited to: rental per annum, expiration date, and renewal options.

(G)   The average effective annual rental per square foot or unit for each of the last three years prior to the date of filing.

(H)   Schedule of the Lease expirations for each of the ten years starting with the year in which the registration statement is filed (or the year in which the prospectus supplement is dated, as applicable), stating:

    (1)   The number of tenants whose Leases will expire.

    (2)   The total area in square feet covered by such Leases.

    (3)   The annual rental represented by such Leases.

    (4)   The percentage of gross annual rental represented by such Leases.

## **SCHEDULE 7**

**Intellectual Property/Websites**
**N/A**

## **SCHEDULE 8**

### **REA**

Easement Agreement between Michael G. Van Asten and Gordon H. Van Asten and Ramona M. Van Asten ("Van Asten") and Beechwood Plaza Hotel of Appleton, LLC, recorded September 8, 1999, Document Number 1341311.